**In re O.P.M. LEASING SERVICES, INC., Debtor.**

**STATE OF WEST VIRGINIA, DEPARTMENT OF FINANCE AND ADMINISTRATION, Plaintiff,**

v.

**James P. HASSETT, as Reorganization Trustee of O.P.M. Leasing Services, O.P.M. Leasing Services, Inc., La Salle National Bank, International Business Machines Corporation, Computer Equipment Services Corporation, Formerly Known as Electronic Memories and Magnetics Corporation, Defendants.**

**Reorganization No. 81 B 10533. Adv. No. 81–5524A.**

United States Bankruptcy Court, S. D. New York.

July 14, 1982.

Glass & Howard, New York City, for State of West Virginia, Dept. of Finance and Administration; Robert Howard, New York City, of counsel.

Zalkin, Rodin & Goodman, New York City, for James P. Hassett, as Chapter 11 Trustee of O.P.M. Leasing Services, Inc.; Richard Toder, New York City, of counsel.

Milbank, Tweed, Hadley & McCloy, New York City, for LaSalle Nat. Bank; John Gellene, New York City, of counsel.

Chauncey H. Browning, Atty. Gen. for State of W. Va., for plaintiff; E. Wayne Basconi, Asst. Atty. Gen., Charleston, W. Va., of counsel.

## DECISION ON LASALLE NATIONAL BANK'S MOTION FOR SUMMARY JUDGMENT AND FOR JUDGMENT ON LA SALLE'S COUNTERCLAIM

BURTON R. LIFLAND, Bankruptcy Judge.

This matter is before the Court on the Motion of LaSalle National Bank ("La-Salle") for Summary Judgment pursuant to Bankruptcy Rule 756[1] and Rule 56 of the Federal Rules of Civil Procedure to dismiss the claim of the State of West Virginia, Department of Finance and Administration ("West Virginia"), and to recover judgment as to liability on LaSalle's counterclaim for accelerated rents.

### I. STATEMENT OF FACTS

The instant adversary proceeding within this Chapter 11 case concerns a set of 22 leases of computer equipment (the "Equipment Schedules") by O.P.M. Leasing Services, Inc. ("OPM"), the debtor herein, to plaintiff West Virginia. Pursuant to three

---

**1.** The citation to Bankruptcy Rule 756 refers to one of the rules contained in the Rules of Bankruptcy Procedure, promulgated by the Supreme Court pursuant to 28 U.S.C. § 2075 for use under the former Bankruptcy Act of 1898, as amended, and applicable under the Bankruptcy Code to the extent not inconsistent. *See* B.R.A. Sections 247, 402 and 405.

security agreements (the "Security Agreements") and three agreements captioned "Consent and Agreement", 19 of these leases are now pledged to defendant LaSalle as security for OPM's indebtedness under three notes held by LaSalle.

West Virginia commenced this adversary proceeding on August 19, 1981 against James P. Hassett as Reorganization Trustee of OPM ("the Trustee"), OPM, LaSalle, International Business Machines Corporation ("IBM") and Computer Equipment Services Corporation ("CES"). The complaint seeks a turnover of $107,252.36, plus accrued interest, from the OPM estate to IBM and CES ("the Maintenance Providers") for maintenance payments which OPM is alleged to have failed to provide, a declaration that the Equipment Schedules have been terminated and an order of the Bankruptcy Court enjoining the Maintenance Providers from terminating maintenance on the hardware pending resolution of the adversary proceeding.[2]

The basis which West Virginia has asserted for this relief is OPM's alleged breach of the Equipment Schedules in its failure to make monthly payments of maintenance fees directly to defendants IBM and CES on 20 of the 22 Equipment Schedules (the "Maintenance Providers"). According to West Virginia's pleadings, this breach by OPM terminates LaSalle's rights as assignee to receive lease payments. Alternatively, West Virginia asserts in its pleadings that LaSalle's purported knowledge of OPM's breach prevents it from claiming that the Equipment Schedules have not terminated.

LaSalle's answer denies all of the material allegations of the complaint and alleges as an affirmative defense that the terms of the Consent and Agreements executed by West Virginia bar West Virginia's claim. LaSalle also asserts in a counterclaim that beginning in March, 1981, West Virginia failed to make the full amount of lease payments under the Equipment Schedules assigned to LaSalle. LaSalle gave written notice of West Virginia's default and of its election to accelerate the balance of assigned lease payments pursuant to Section 12.2 of the Master Lease. Accordingly, LaSalle seeks judgment herein on its counterclaim in the amount of $2,116,388.30, although LaSalle's present motion seeks judgment on liability only.

The reply of West Virginia to LaSalle's counterclaim denies all its material allegations and asserts nine affirmative defenses. These defenses include sovereign immunity under the Tenth and Eleventh Amendments and under West Virginia law, waiver by LaSalle of its right to accelerate rent payments, full payment of all rentals due to LaSalle and that LaSalle is bound by its assignor's default in making maintenance payments.

The Trustee has also contemporaneously moved to reject the 19 leases which were assigned to LaSalle.[3] LaSalle opposes this motion to reject based on its concern that its security interest in the lease payments will not be adequately protected if West Virginia's absolute and unconditional promise to pay rents is not fully enforced.

*The Agreements Governing the Transactions at Issue*

The rights and duties of each of the three parties to the computer leases at issue herein are specified in the Master Lease as well as in the Equipment Schedules, the Security Agreements and the Consents and Agreements.

West Virginia, as lessee, and OPM, as lessor, are parties to the Master Lease dat-

---

**2.** West Virginia and the Maintenance Providers entered into a stipulation in the adversary proceeding that the Maintenance Providers would continue to provide maintenance on the hardware pending resolution of the adversary proceeding in exchange for West Virginia's continued remittance of current maintenance payments. This stipulation was so ordered by the Bankruptcy Court on October 9, 1981.

**3.** In the Trustee's motion to reject the 19 assigned leases, he also moved to assume the three unassigned leases. That portion of this motion relating to assumption only was the subject of a Stipulation of Settlement between West Virginia and the Trustee which was So Ordered by this Court on June 29, 1982.

ed March 28, 1980. Each Equipment Schedule incorporates all of the terms and conditions of the Master Lease. The Master Lease and each Equipment Schedule are to be construed in accordance with New York law.

Section 5.3 of the Master Lease between OPM and West Virginia contains detailed provisions regarding assignments of Equipment Schedules by OPM. Section 5.3(ii) provides that OPM's "assignee shall not be obligated to perform any of the obligations of (OPM) under any Equipment Schedule other than [OPM's] obligation not to take any action to disturb Lessee's quiet and peaceful possession of the Equipment." In Section 5.3(iii) the parties agree that "(l)essee's obligation to pay directly to such assignee the amounts due from lessee under any Equipment Schedule ... shall be *absolutely unconditional* and shall be payable whether or not any Equipment Schedule is terminated by operation of law, any act of the parties or otherwise." (emphasis added) ("the hell or high water clause"). In Section 5.3(iv), OPM and West Virginia agreed that West Virginia is to pay all amounts due under any Equipment Schedule to OPM's assignee "notwithstanding any defense, offset or counterclaim whatever whether by reason of breach of such Equipment Schedule or otherwise which it may or might now or hereafter have as against Lessor (Lessee reserving its right to have recourse directly against Lessor on account of any such counterclaim or offset)." ("the waiver of defenses clause"). Section 14 of the Master Lease provides that the lessee's unconditional obligation to an assignee continues "until all amounts ... shall have been paid in full."

Each Equipment Schedule obligates OPM to reimburse West Virginia for monthly maintenance charges actually paid by West Virginia under West Virginia's separate maintenance agreements with the Maintenance Providers for the leased equipment. However, Paragraph 4(a) of each Equipment Schedule provides that OPM's obligation to pay for maintenance of the equipment leased to lessee "shall in (no) manner diminish, impair or otherwise affect any of Lessee's obligations under this Equipment Schedule, including, without limitation, the payment of all monthly rental payments..." Thus, by the terms of these Schedules, West Virginia specifically agreed that any breach of OPM's maintenance obligations shall not affect West Virginia's duty to make monthly lease payments.

The three Security Agreements, identical in form, assign as security to LaSalle OPM's interest in 19 of OPM's 22 Equipment Schedules.[4] Each Security Agreement provides for the assignment of all of West Virginia's monthly lease payments to LaSalle.[5] According to these Security Agreements, LaSalle may demand payment or delivery of and shall receive and collect all money under the assigned Equipment Schedules and apply the funds to OPM's indebtedness. Furthermore, according to Section 1.08 of these Security Agreements, upon a default by West Virginia under the Master Lease, LaSalle is entitled to exercise all of OPM's rights under the assigned Equipment Schedules, but is not thereby to assume any of OPM's obligations to West Virginia.

In each Consent and Agreement, West Virginia acknowledges and consents to OPM's assignment of Equipment Schedules to LaSalle. West Virginia also agrees

---

4. By these three Security Agreements, LaSalle originally held a security interest in 20 of the Equipment Schedules. However, a letter agreement dated August 28, 1980 released LaSalle's security interest in Equipment Schedule No. 1–02 and the computer equipment leased to West Virginia thereunder. LaSalle continues to hold a security interest in the remaining 19 Equipment Schedules.

5. The 22 Equipment Schedules were classified as "Series A" (5 Schedules), "Series B" (4 Schedules), "Series C" (10 Schedules), and "Unclassified" (3 Schedules). LaSalle transferred funds to OPM in consideration of assignment of OPM's interest in these Schedules as follows:

Series A—June 10, 1980/Series C—August 28, 1980
Series B—August 28, 1980/Unclassified—Never Assigned

therein to make all monthly lease payments to LaSalle "without abatement, reduction, counterclaim or offset ... as a result of any breach of any obligation of OPM." *See* Affidavit of Ray H. Camp in support of LaSalle's Summary Judgment Motion ("Camp Affidavit"), Exhibits 9, 10 and 11 at 2.

In addition, opinions from the office of the highest legal officer of West Virginia as to the enforceability of the Equipment Schedules were provided on two occasions. The Deputy Attorney General wrote that the Equipment Schedules and Consents and Agreements each constituted "a legal, valid and binding instrument enforceable in accordance with its terms against (West Virginia)". He qualified this opinion only by asserting: "My opinion is qualified to the extent that the remedies available to enforce your rights under the Transactional Documents may be limited by bankruptcy, insolvency and other laws respecting creditors' rights and remedies generally." *See* Camp Affidavit, Exhibit 5, at 3, Exhibit 7 at 13.

West Virginia concedes having made no monthly lease payments during March, April, May and June 1981. Following these four successive months of default, on July 3, 1981, LaSalle gave West Virginia written notice of its default and of LaSalle's election to accelerate the balance of lease payments. It was not until after LaSalle's notice of acceleration in July 1981 that West Virginia made lease payments on the assigned Equipment Schedules totalling $160,125.00 for the months of March, April and May 1981. LaSalle contends that this amount was less than the properly corresponding amount of West Virginia's lease obligation.[6]

## II. ISSUES PRESENTED

The issues presented by LaSalle's motion for summary judgment on its counterclaim and by West Virginia's crossmotion to dismiss LaSalle's counterclaim are:

(1) Whether West Virginia can validly assert that it is immune from LaSalle's counterclaim for accelerated rents because it chooses to invoke its sovereign immunity;

(2) Whether there remain any material issues of fact in dispute so as to preclude summary judgment in favor of LaSalle or whether LaSalle may be granted judgment as a matter of law on its counterclaim for accelerated rentals;

(3) Whether the clause in the Master Lease between OPM and West Virginia creating West Virginia's "absolutely unconditional" obligation to pay rents to OPM's assignee (LaSalle) shall be given full force and effect as a matter of law despite OPM's breach of its maintenance payments obligation.

For the reasons hereinafter stated we grant LaSalle summary judgment on its counterclaim for accelerated rentals and deny West Virginia's motion to dismiss this counterclaim.

## III. DISCUSSION OF LAW

### A. *Waiver of Sovereign Immunity*

West Virginia contends that LaSalle's counterclaim is not cognizable in this Court because it chooses to invoke its sovereign immunity to this counterclaim. For the reasons hereinafter stated, this Court holds that West Virginia has irrevocably waived its sovereign immunity by initiating these proceedings.

The Eleventh Amendment to the United States Constitution provides:

> The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

---

**6.** West Virginia has failed to make any lease payments since the commencement of this adversary proceeding in August 1981. However, it has made "use and occupancy" payments into an escrow fund at the rate of $61,100 (exclusive of maintenance) per month retroactively and $86,060 (inclusive of maintenance) per month pursuant to an escrow order by this court dated December 11, 1981.

One well-established exception to the general sovereign immunity of states conferred by the Eleventh Amendment is where Congress has conditioned a state's participation in a federally regulated activity upon an abrogation of sovereign immunity. Participation by the state thus amounts to a consent to jurisdiction and a waiver of Eleventh Amendment immunity. *See, e.g., Fitzpatrick v. Bitzer*, 427 U.S. 445, 452–53, 96 S.Ct. 2666, 2669–70, 49 L.Ed.2d 614 (1976) (damage suits against state under Title VII for employment discrimination not barred); *Parden v. Terminal Railway*, 377 U.S. 184, 190–92, 84 S.Ct. 1207, 1211–12, 12 L.Ed.2d 233 (1964) (suit under Federal Employers' Liability Act permitted against state operating a railroad); *Petty v. Tennessee-Missouri Bridge Commission*, 359 U.S. 275, 278–82, 79 S.Ct. 785, 788–93, 3 L.Ed.2d 804 (1959) (damage action against state allowed by Congressional proviso to interstate compact).

Similarly, by means of Section 106(a) of the Bankruptcy Reform Act ("the Code"), 11 U.S.C. § 106(a) (Supp. IV 1980), Congress has expressly conditioned West Virginia's commencement of litigation in the bankruptcy court on the abrogation of its sovereign immunity.

Bankruptcy Code Section 106(a) provides:

A governmental unit is deemed to have waived sovereign immunity with respect to any claim against such governmental unit that is property of the estate and that arose out of the same transaction or occurrence out of which such governmental unit's claim arose.

11 U.S.C. § 106(a) (Supp. IV 1980).

The legislative history of this section demonstrates Congress' intent to abrogate a state's sovereign immunity when to do otherwise would be contrary to bankruptcy policy. Congress stated:

Section 106 provides for a limited waiver of sovereign immunity.... Congress does not ... have the power to waive sovereign immunity completely with respect to claims of a bankrupt estate against a State, *though it may exercise its bankruptcy power through the supremacy clause to prevent or prohibit State action that is contrary to bankruptcy policy.*
There is, however, a limited change in the result from the result that would prevail in the absence of bankruptcy.... First, the filing of a proof of claim against the estate by a governmental unit is a waiver by that governmental unit of sovereign immunity with respect to compulsory counterclaims, as defined in the Federal Rules of Civil Procedure, that is, counterclaims arising out of the same transaction or occurrence.

H.R.Rep.No.595, 95th Cong., 1st Sess. 317 (1977); S.Rep.No.989, 95th Cong., 2d Sess. 29 (1978) U.S.Code Cong. & Admin.News 1978, pp. 5787, 5815, 6274 (emphasis added).

This bankruptcy provision was thus promulgated by Congress out of a desire to prohibit a governmental unit from receiving "distribution from the estate without subjecting itself to any liability it has to the estate within the confines of a compulsory counterclaim rule." *See id.* The legislative history continues: "Any other result would be one-sided. The counterclaim by the estate against the governmental unit is without limit." *See id.*

LaSalle argues that the instant case presents exactly the kind of situation which this bankruptcy section was promulgated to cover. West Virginia contends that because LaSalle's counterclaim is not "property of the estate" and because West Virginia is not asserting a "claim" against the OPM estate, this section providing a waiver of sovereign immunity does not apply here.[7] West Virginia asserts no opposi-

---

7. West Virginia also contends that under the law of the State of West Virginia, it is immune from the instant suit by LaSalle. West Virginia is apparently attempting to rely on Article VI, Section 35 of the West Virginia Constitution which provides: "The State of West Virginia shall never be made defendant in any court of law or equity...." LaSalle opposes this contention, distinguishing a direct suit against the state from the compulsory counterclaim it asserts herein. LaSalle argues that a compulsory counterclaim against the state is not proscribed

tion to LaSalle's allegation that the counterclaim arises out of the same transaction or occurrence as does West Virginia's main claim. West Virginia further contends that even if it is deemed to have waived its sovereign immunity herein, it can only be held liable on LaSalle's $2 million counterclaim up to the amount of its main claim or as a setoff to the extent of approximately $107,000.[8] This court agrees with LaSalle and finds that the counterclaim by LaSalle for accelerated rents should properly be designated as "property of the estate" and that West Virginia has asserted a "claim" against the OPM estate by filing its complaint to initiate the instant adversary proceeding. This court further holds that under Section 106(a), LaSalle can assert its counterclaim against West Virginia without limit.

West Virginia's main claim in the instant action constitutes a "claim" within the meaning of Section 106(a). The term "claim" is defined in Section 101(4) of the Bankruptcy Code as:

(A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured; or

(B) right to an equitable remedy for breach of performance if such breach gives rise to a right of payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.[9]

11 U.S.C. § 101(4) (Supp. IV 1980).

West Virginia's complaint asserts a "right to payment" out of the OPM estate

---

by the West Virginia Constitution. *See State v. Ruthbell Coal Co.*, 133 W.Va. 319, 56 S.E.2d 549 (1949). *But see State Road Commission v. Ball*, 138 W.Va. 349, 76 S.E.2d 55 (1953) (denying affirmative judgment on counterclaim against West Virginia).

It is not necessary for this bankruptcy court to decide the parameters of West Virginia law on this issue because Congress, through Section 106(a), has empowered a bankruptcy court to prevent or prohibit such state action as is contrary to bankruptcy policy. Such action which is contrary to bankruptcy policy includes commencing an action in bankruptcy court while remaining immune to a compulsory counterclaim stemming from that suit. *See* H.R.Rep. No.595, 95th Cong., 1st Sess. 317 (1977); S.Rep.No.989, 95th Cong., 2nd Sess. 20 (1978). Moreover, the parties elected in the Master Lease not to be governed by the law of the State of West Virginia, but rather by the law of the State of New York.

West Virginia also asserts in its Reply to LaSalle's counterclaim, although not in its briefs, that LaSalle's counterclaim is barred by the Tenth Amendment to the U. S. Constitution pursuant to the holding in *National League of Cities v. Usery*, 426 U.S. 833, 852, 96 S.Ct. 2465, 2474, 49 L.Ed.2d 245 (1976). This Court finds that the Tenth Amendment is no bar to the assertion of LaSalle's counterclaim in this bankruptcy case. *In Re Glidden*, 653 F.2d 85, 87–88 (2d Cir. 1981). *See also Hodel v. Virginia Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981).

8. West Virginia argues that under general Eleventh Amendment principles, West Virginia has not waived its sovereign immunity by bringing

the main claim in this action and that there thus can be no affirmative recovery by LaSalle over and above the amount of West Virginia's main claim. Absent the application of Section 106(a) and general principles of equity, West Virginia might be correct depending upon the law of the State of West Virginia regarding waiver of immunity. *See Ford Motor Co. v. Dep't of Treasury of Indiana*, 323 U.S. 459, 65 S.Ct. 347, 89 L.Ed. 389 (1945) (declaring that sovereign immunity can be waived only where the sovereign state so consents by Constitutional provision, statute or otherwise); *Skehan v. Board of Trustees of Bloomsburg State College*, 669 F.2d 142 (3d Cir. 1982). *See also Alaska v. O/S Lynn Kendall*, 310 F.Supp. 433 (D.Alaska 1970). For a discussion of the law of the State of West Virginia on waiver of sovereign immunity, *see supra* Note 7.

However, this bankruptcy case must be decided taking into consideration Section 106(a) of the Code, which Section abrogates West Virginia's Eleventh Amendment sovereign immunity to the full extent of LaSalle's counterclaim when West Virginia opens the courthouse door to bring its main claim against LaSalle.

9. The legislative history to Section 101(4) of the Code describes the scope of a "claim" as broad:

Under Section 1 of the Old Act, "claim" was not defined. The term was only used with the concept of provability in Section 63 of the Act to limit the kinds of debts that were payable in a bankruptcy case. The Code defines the term much more broadly. (restating provision)

H.R.Rep.No.595, 95th Cong., 1st Sess., 309 (1977), S.Rep.No.989, 95th Cong., 2d Sess. 21

on behalf of the Maintenance Providers, to which providers West Virginia is indebted. This is so because the contract by which the Maintenance Providers are paid is solely between West Virginia and the Maintenance Providers. OPM has merely agreed in Paragraph 4(a) of the Equipment Schedules that it will reimburse all monies expended by West Virginia for maintenance. Thus, since OPM has no direct obligation to the Maintenance Providers, the "right to payment" belongs to West Virginia.

In addition, West Virginia has moved this court to fix a sum for the continued use of the leased computer equipment if the Equipment Schedules are rejected by the Trustee. Because rejection of the Equipment Schedules would be equivalent to their breach, *see* 11 U.S.C. § 365(g), (Supp. IV 1980), West Virginia's motion to set a sum for "use and occupancy" asserts a claim under Section 101(4)(B) of the Bankruptcy Code in asserting a right to an equitable remedy for breach of performance. Even though this asserted right is both "contingent" and "disputed", it nevertheless qualifies as a "claim" under Section 106(a). *See* 11 U.S.C. § 101(4)(B) (Supp. IV 1980).

Moreover, the counterclaim asserted by LaSalle is properly viewed as "property of the (OPM) estate" as that term is defined in the Code. Section 541 of the Code defines "property of the estate" expansively as did its predecessor Act provision, Section 70(a)(5).[10]

Collier on Bankruptcy Section 541.06 describes the scope of this Code provision as pervasive, stating:

> Because the scope of Section 541(a)(1) is *so broad and all encompassing*, the discussion in the following paragraphs cannot be considered exhaustive. It is important to keep in mind therefore that the underlying theory of Section 541(a)(1) is to bring into the estate all interests of the debtor in property as of the date the case is commenced. Thus, as a general rule, the estate created under Section 541 will include all legal or equitable interests of the debtor in property both tangible and intangible . . .

4 Collier on Bankruptcy § 541.06 (15th Ed. 1981).[11]

The court in *In re Community Hospital*, 5 B.R. 7, 5 B.C.D. 1115, 1 C.B.C.2d 216 (Bkrtcy.S.D.N.Y.1979), *aff'd*, 5 B.R. 11, 5 B.C.D. 1172, 1 C.B.C.2d 291 (D.C.S.D.N.Y. 1980), a bankruptcy case involving sovereign immunity cited by West Virginia,[12] echoed this expansive definition of property of the estate. Judge Schwartzberg therein stated that Code Section 541 is no longer concerned with who has title or possession of property of the estate because the estate includes all legal or equitable interests of the debtor in property as of the commencement of the case. *See Community Hospital*,

(1978), U.S.Code Cong. & Admin.News 1978, pp. 5807, 6266.

**10.** The Supreme Court in *Segal v. Rochelle*, 382 U.S. 375, 379, 86 S.Ct. 511, 515, 15 L.Ed.2d 428 (1965), decided under the predecessor Act, held:

> The main thrust of § 70(a)(5) is to secure for creditors everything of value the bankrupt may possess in alienable or leviable form when he files his petition. *To this end, the term "property" has been construed most generously and an interest is not outside its reach because it is novel or contingent or because its enjoyment is postponed.* (citations omitted) (emphasis added).

**11.** This treatise also reports that claims against the government are property of the estate under § 541(a) which may be pursued as permitted by Section 106. *See* Collier, *supra* at § 541.10(4).

**12.** West Virginia's reliance on *Community Hospital, supra,* like its reliance on *In re Regal Construction Co., Inc.,* 18 B.R. 353 (Bkrtcy.D. Md.1982), is misplaced. The courts in both of these cases found that sovereign immunity had not been waived. However, in *Community Hospital,* Judge Schwartzberg stated that Section 106(a) did not apply because it was conceded that the issue before the court did not involve a compulsory counterclaim to a governmental claim. 5 B.R. at 11. Similarly, in *Regal Construction,* the governmental unit did not perform any affirmative act that would have waived its immunity. *See* 18 B.R. at 357. In contrast, the instant case does involve a compulsory counterclaim to a main claim by a governmental unit. West Virginia cites and the court has found no other cases decided under Section 106 in support of West Virginia's position.

5 B.R. at 10, 5 B.C.D. at 1117, 1 C.B.C.2d at 220. *See also In re Greer Stump Plumbing*, 9 B.R. 181, 4 C.B.C.2d 139 (Bkrtcy.D.Ariz. 1981) (holding that the concept of property of the estate has been greatly broadened by the Code).

Most recently, the bankruptcy court in the Western District of Kentucky in *In re Hurricane Elkhorn Coal Corp. II*, 19 B.R. 609, 8 B.C.D. 1243 (Bkrtcy.W.D.Ky.1982), held that an assignment which is in substance an assignment for security to a bank does not divest a debtor of all interest in those accounts receivable and that the debtor's interest in these funds is enough to bring the funds themselves into the estate under Code Section 541(a)(1). The court, citing the "expansive definition" of property of the estate under Section 541, 19 B.R. at 617, 8 B.C.D. at 1247, thus compelled the turnover directly to the Bank-assignee of funds which had been held by the creditor as a setoff of its claim against the debtor based on the creditor's pre-petition overpayment to the bank of money it owed the debtor.

The court in *Hurricane Elkhorn* found support for its holding in cases holding that a debtor may compel the turnover of property which was levied on pre-petition by a governmental taxing authority. *See, e.g., In re Whiting Pools*, 674 F.2d 144 (2d Cir. 1982); *Bristol Convalescent Home, Inc. v. IRS*, 12 B.R. 448, 7 B.C.D. 1151, 4 C.B.C.2d 1167 (Bkrtcy.D.Conn.1981); *In re Hudson Valley Ambulance Service, Inc.*, 11 B.R. 860 (Bkrtcy.S.D.N.Y.1981). The rationale in these cases for turnover to the debtor of property out of his possession is that the prepetition levy by the taxing authority does not completely divest the debtor's estate of all interest in the property. Thus the court in *Hurricane Elkhorn* reasoned:

(T)he (tax levy cases) approach creates a presumption of includability in the estate leaving it to the property claimant to rebut the presumption and retrieve the property interest from the estate. That is a view compatible with the broadened definition of "property" and the expanded jurisdiction of this Court under the Bankruptcy Code, and we adopt that view.

*In re Hurricane Elkhorn*, 19 B.R. at 618, 8 B.C.D. at 1248.

The court in *Hurricane Elkhorn* found further support in the "long standing rule that property subject to liens or encumbrances is not precluded from becoming property of the estate, but becomes an estate asset subject to any existing liens." *Id.*, citing, *e.g., In re National Grain Corp.*, 9 F.2d 802 (2d Cir. 1926).

■ In the instant case as *In re Hurricane Elkhorn*, the agreements among the parties require the conclusion that LaSalle's counterclaim for rentals, which counterclaim was assigned to it as security for OPM's debt to LaSalle, is property of the estate. As the court declared in *In re Hurricane Elkhorn*, the counterclaim must be presumed to be part of the estate until such presumption is rebutted. West Virginia has not succeeded in rebutting this presumption.

■ It is without question that OPM assigned its right to lease payments from West Virginia as security for OPM's debt to LaSalle (*See* Camp Aff. Ex. 1, p. 1). These lease payments flowing from West Virginia to LaSalle were designed to decrease on a gradual basis OPM's debt to LaSalle which these payments secured. Thus, the enforcement by LaSalle of its right to receive the full amount of lease payments from West Virginia benefits not only LaSalle, but also the OPM estate in vitiating OPM's debt to LaSalle by discharging LaSalle's lien on the equipment. Accordingly, OPM's assignment of the right to receive rentals from West Virginia to LaSalle does not completely divest the debtors' estate of all interest in the property. *See In re National Grain Corp.*, (2nd Cir.) 9 F.2d 802; *In re Hurricane Elkhorn*, (Bkrtcy.W.D.Ky.) 19 B.R. 609, 8 B.C.D. 1243.

Moreover, Master Lease Section 8 provides that the equipment is to be returned to OPM upon the expiration of the lease term. Thus, OPM clearly has a residual interest in the equipment it leased to West Virginia.

 In addition, it is well-settled that a promisee as well as a contract's third party beneficiary may sue the promisor to enforce the contract. *See, e.g., In re Spong,* 661 F.2d 6 (2d Cir. 1981); *Associated Teachers v. Board of Education,* 33 N.Y.2d 229, 234, 306 N.E.2d 791, 794, 351 N.Y.S.2d 670, 674 (1973). Thus, OPM, as the promisee of West Virginia's promise to pay rents to LaSalle, had the right to sue West Virginia to enforce this right for the third party beneficiary, LaSalle. This right of action possessed by OPM against West Virginia, whether acquired before or after commencement of the Chapter 11 case, is "property of the estate". *See* 11 U.S.C. § 541(a)(1), (7) (Supp. IV 1980).

Moreover, Section 1.08 of Security Agreements between LaSalle and OPM (*e.g.* Camp Affidavit, Ex. 1) also provides that upon the occurrence of any event of default, including a default by West Virginia, LaSalle is entitled to exercise all of OPM's rights under the Equipment Schedules. (*See id.* at 5).

 Under this analysis, it is without question that LaSalle's counterclaim fits well within Section 541's broad definition of property of the estate. In addition, LaSalle's counterclaim is cognizable not merely to the extent of West Virginia's main claim, but without limit. *See* H.R. Rep.No.595, 95th Cong., 1st Sess. 317 (1977), S.Rep.No.989, 95th Cong., 2nd Sess. 29 (1978); *In re Community Hospital,* Bkrtcy. S.D.N.Y., 5 B.R. 7, 5 B.C.D. 1115, 1 C.B.C.2d 216 *aff'd,* (D.C.S.D.N.Y.) 5 B.R. 11, 5 B.C.D. 1172, 1 C.B.C.2d 291. Accordingly, this Court finds that Section 106(a) applies in the instant case to waive West Virginia's

sovereign immunity to the full extent of LaSalle's counterclaim.[13]

*B. Merits of LaSalle's Counterclaim*

*1. Hell and High Water Clause*

LaSalle contends that it is entitled to summary judgment as to West Virginia's liability on LaSalle's counterclaim for accelerated rental payments[14] pursuant to Rule 56 of the Federal Rules of Civil Procedure as adopted in bankruptcy matters by Bankruptcy Rule 756. West Virginia contends that LaSalle is not entitled to judgment as a matter of law because there are material issues of fact in dispute as to whether LaSalle took its assignment of rents from OPM in good faith without notice of claims or defenses. For the reasons hereinafter detailed, we grant summary judgment to LaSalle on its counterclaim as to West Virginia's liability.

 This holding is based on our view that under New York law, which applies pursuant to the terms of the Master Lease, the plain meaning of West Virginia's absolutely unconditional promise to make rental payments to OPM must be given full force and effect as a matter of law. *See, e.g., Breed v. Insurance Co. of North America,* 46 N.Y.2d 351, 385 N.E.2d 1280, 413 N.Y. S.2d 352 (1978); *Laba v. Carey,* 29 N.Y.2d 302, 277 N.E.2d 641, 327 N.Y.S.2d 613 (1971); *Luna Park Housing Corp. v. Besser,* 38 A.D.2d 713, 329 N.Y.S.2d 332 (2d Dep't 1972).

This "hell or high water" provision contained in Section 5.3(iii) of the Master Lease provides:

---

**13.** A similar result would be reached under general principles of equity even absent the application of Section 106(a) of the Bankruptcy Code. This Court could require West Virginia to pay rent to LaSalle as a·condition precedent to the legal and equitable relief West Virginia has sought in commencing this adversary proceeding. One who seeks a declaration from the court that his obligations on a lease agreement are terminated cannot be allowed to remain in possession of the leased property without paying a reasonable value for it. · *See United States v. Bedford Associates,* 618 F.2d 904 (2d Cir.

1980), *modified,* 657 F.2d 1300 (1981). *See also Jacobs v. United States,* 239 F.2d 459 (4th Cir. 1956), *cert. denied,* 353 U.S. 904, 77 S.Ct. 666, 1 L.Ed.2d 666 (1957); *Lacy v. United States,* 216 F.2d 223 (5th Cir. 1954).

**14.** LaSalle is fully entitled to accelerate the rentals due it from West Virginia upon West Virginia's default pursuant to Section 12.2 of the Master Lease. In addition, it informed West Virginia in writing of its intention to accelerate although it was not obligated to give such notice pursuant to Section 12.2.

(iii) (West Virginia's) obligation to pay directly to such assignee the amounts due from Lessee under any Equipment Schedule (whether as rent or otherwise) shall be *absolutely unconditional* and shall be payable whether or not *any* Equipment Schedule is terminated by operation of law, any act of the parties or otherwise ... (emphasis added).[15]

In essence, this unequivocal provision mandates that regardless of any remedies West Virginia may invoke against OPM, including a defense or claim as to OPM's default in paying the Maintenance Providers, West Virginia may not terminate La-Salle's unconditional right to payment. West Virginia was well aware of this unconditional right to payment of rentals when it executed the Consent and Agreements to the assignments by OPM to La-Salle. *See* Camp Affidavit, Exhibits 9, 10 and 11. In addition, the Attorney General of West Virginia gave his express written approval to the content of the Master Lease between OPM and LaSalle, including this hell and high water clause. *See* Camp Affidavit, Exhibit 5 at 3, and Exhibit 7 at 3.

To deny this clause its full force and effect would effectively reconstruct the contract contrary to the intent of the parties, which reconstruction would be impermissible. *See, e.g., Rodolitz v. Neptune Paper Products, Inc.,* 22 N.Y.2d 383, 386, 239 N.E.2d 628, 630, 292 N.Y.S.2d 878, 881 (1968).

 Moreover, it is a well-settled principle that "parties to a contract are given broad latitude within which to fashion their own remedies for breach of contract.... It follows that contractual limitations upon remedies are generally to be enforced unless unconscionable".[16] *Wilson Trading Corp. v. David Ferguson, Ltd.,* 23 N.Y.2d 398, 404, 244 N.E.2d 685, 687, 297 N.Y.S.2d 108, 111–112 (1968).

More specifically, courts have uniformly given full force and effect to "hell and high water" clauses in the face of various kinds

---

**15.** In addition, Section 4(a) of the Equipment Schedules, the source of OPM's maintenance obligations to West Virginia, contains another express limitation on West Virginia's remedies for any failure by OPM to make maintenance payments. It provides:

(West Virginia) covenants and agrees that nothing contained in this Section 4(a) shall in any manner diminish, impair or otherwise affect any of (West Virginia's) obligations under this Equipment Schedule, including, without limitation, the payment of all monthly rental payments ... (OPM) shall indemnify and hold (West Virginia) harmless in respect of any losses suffered by (West Virginia) by reason of a failure to pay (maintenance charges) ....

**16.** Even considering the law of the State of West Virginia, (although West Virginia does not expressly dispute in its submissions to this Court that the rights and liabilities of the parties are governed by the law of the State of New York) the hell and high water clause herein is not illegal or unconscionable as West Virginia urges.

West Virginia has cited and this court has found no West Virginia statute or other provision proscribing double payments by West Virginia. Also West Virginia has misconstrued the effect of a rejection by the OPM Trustee of the 19 leases at issue. Contrary to that which West Virginia asserts, rejection of these leases would not terminate the Equipment Schedules and require the turnover of the equipment. Such a rejection merely constitutes a breach of the lease. *See* Code Section 365(g) Supp. IV 1980. Counsel for the Trustee and LaSalle, recognizing this point, expressly waiving rights, declared that they have absolutely no interest in retrieving the equipment while at the same time requiring West Virginia to pay rent for it. *See* Transcript of Oral Argument on the instant motions at pp. 40, 75–76.

Moreover, if West Virginia is required to make double maintenance payments, these payments are a foreseeable consequence flowing from the structure of the maintenance payments contracts. West Virginia and OPM structured the arrangement in such a way as to make West Virginia *directly liable to the Maintenance Providers* while making OPM liable to West Virginia for reimbursement of these payments. However, the Maintenance Providers were not made a party to OPM's agreement to reimburse West Virginia. By not making the Maintenance Providers a party to this agreement, West Virginia left itself vulnerable to the possibility of double payments.

Furthermore, the highest legal officer of the State of West Virginia expressly approved the content of these leases. The Attorney General's Office declared each of them "a legal, valid and binding instrument enforceable in accordance with its terms ..." Camp Affidavit, Ex 5 at 3, Ex 7 at 3.

of defaults by the party seeking to enforce them. *National Equipment Rental v. J. & I. Carting, Inc.*, 73 A.D.2d 666, 423 N.Y.S.2d 205 (2d Dep't 1979); *Dixie Groceries, Inc. v. Albany Business Machines*, 156 Ga.App. 36, 274 S.E.2d 81, 83 (1980). *See also First National Bank of Atlanta v. Harrison*, 408 F.Supp. 137, 140 (N.D.Ga.1975), *aff'd*, 529 F.2d 1350 (5th Cir. 1976).[17]

The courts in all of the above-cited cases held that clauses containing unconditional promises are strictly enforceable as a matter of law. In so doing, they have found summary judgment in favor of the lessor or its assignee because no facts submitted or to be submitted by the lessee opposing summary judgment are in any way relevant to the lessee's unequivocal liability based on these hell and high water provisions.[18]

In *National Equipment Rental, supra,* the court, faced with a lessor's failure to file a criminal complaint against an alleged thief of the equipment at issue, held that the lessor's inaction did not constitute a defense as a matter of law to the lessee's obligation to pay rent unconditionally. Similarly, in *Dixie Groceries, supra,* the Georgia court held that such a clause in an equipment lease remains inviolate as a matter of law, even where facts submitted by the lessee show a failure by the lessor to repair or maintain the equipment.[19]

The essential practical consideration requiring liability as a matter of law in these situations is that these clauses are essential to the equipment leasing industry. To deny their effect as a matter of law would seriously chill business in this industry because it is by means of these clauses that a prospective financer-assignee of rental payments is guaranteed meaningful security for his outright loan to the lessor. Without giving full effect to such clauses, if the equipment were to malfunction, the only security for this assignee would be to repossess equipment with substantially diminished value. *See Contino, supra,* at 87; *B. Fritch and A. Reitman, Equipment Leasing-Leveraged Leasing,* 131–32 (1977).

Further justification for giving full force and effect to the hell and high water clause herein is found in the fact that OPM is a finance lessor, not a merchant lessor. Courts have distinguished between these two types of equipment lessors in determining whether a lessor's obligation to make payments is separate and apart from the maintenance and performance of the equipment. In the instant case, the lessor involved is a finance lessor whose only service is to provide funds and who is not merchant lessor. A merchant lessor is one who deals in goods and holds itself out as having specialized knowledge about the design, operation and repair of the chattel leased. *See Patriot General Life Insurance v. CFC Investment Co.,* —— Mass.App. ——, 420 N.E.2d 918 (1981). Since OPM only provided the financing for the lease to West Virginia and thus is a finance lessor, West Virginia had no independently justifiable reason to rely upon OPM for any technical

---

17. In addition, commentators have echoed the strict enforceability of these hell or high water clauses. *See, e.g.,* R. Contino, *Legal and Financial Aspects of Equipment Leasing Transactions,* 29, 87–88 (1979), where the author states:

> Finance leases frequently contain a "hell or high water" rent commitment. Under this type of obligation, a lessee is required to *unconditionally* pay the full rent when due. He is not permitted to make any deduction even though he has a legitimate claim against the lessor for money owed. This is not as bad as it sounds for a lessee, since he can still bring a lawsuit against the lessor for any claims.

*Id.* at 29.

18. In addition, conspicuous disclaimers of warranty, like hell and high water clauses, have served as the basis for decisions enabling equipment lessors to collect lease payments notwithstanding the merchantability of these leased products. *See, e.g., Glenn Dick Equipment Co. v. Galey Construction, Inc.,* 97 Idaho 216, 541 P.2d 1184 (1975); *Bakal v. Burroughs Corp.,* 74 Misc.2d 202, 205, 343 N.Y.S.2d 541 (N.Y.Sup.Ct.1972).

19. In like fashion, the court in *Luna, supra* found summary judgment based on the plain meaning of an unequivocal apartment lease provision. Furthermore, the court, in *First National Bank of Atlanta, supra,* held that the parol evidence rule barred the introduction of facts concerning an alleged oral contract in the face of an unconditional promisory note.

judgment or to hold OPM responsible for the making of maintenance payments on its behalf. *See id.*

■ Accordingly, whether a bad faith assignment or an assignment on notice of default in maintenance payments took place is irrelevant in deciding this summary judgment motion because of the inclusion of a hell and high water clause in the Master Lease. Thus, under Rule 56(c), as applied in bankruptcy matters by Rule 756, West Virginia has failed to demonstrate a genuine issue of material fact and the case is ripe for summary judgment. *See Leasing Services Corporation v. Justice and Childers,* 673 F.2d 70 (2d Cir. 1982).

The argument advanced by West Virginia against summary judgment concerning facts to be raised by it imputing notice or lack of good faith to LaSalle is misplaced; such facts could only perhaps have relevance absent a hell and high water clause. West Virginia has apparently confused the hell and high water provision with the waiver of defenses clause which was also included in the Master Lease, Section 5.3(iv).[20] If only a waiver of defense clause were present, then, pursuant to Uniform Commercial Code Section 9–206,[21] this court would have to examine the sufficiency of the facts raised by West Virginia concern-ing LaSalle's purported lack of good faith and notice of default in taking the assignment. However, here, the hell and high water clause renders West Virginia liable as a matter of law irrespective of any inference raised as to notice or good faith.[22]

Accordingly, this court grants summary judgment on liability only in favor of LaSalle on its counterclaim for accelerated rentals.

### 2. The Result Absent Hell and High Water

■ Even absent this Court's granting full force and effect to the hell and high water clause in the Master Lease, West Virginia's merely conclusory allegation that LaSalle took the assignment in bad faith and with notice of default is insufficient to raise a triable issue of fact because West Virginia has failed to plead the facts constituting alleged fraud and notice with the specificity required by Rule 56(c). Thus, under Section 9–206 of the Uniform Commercial Code, West Virginia's contractual waiver of all defenses to LaSalle's counterclaim for rental payments, including the waiver of its defense of default in maintenance payments, is enforceable.

■ The thrust of West Virginia's Rule 3(g) statement [23] and other affidavits in op-

---

**20.** This clause waiving defenses which West Virginia could have asserted against OPM absent an assignment to LaSalle is contained in Section 5.3(iv) of the Master Lease. It states:

Lessee shall pay all amounts due from Lessee under any Equipment Schedule (Whether as rent or otherwise) to such assignee, notwithstanding any defense, offset or counterclaim whatever, whether by reason of breach of such Equipment Schedule or otherwise which it may or might now or hereafter have as against Lessor ...

**21.** Uniform Commercial Code Section 9–206 provides in relevant part:

(1) (A)n agreement by a buyer or lessee that he will not assert against an assignee any claim or defense which he may have against the seller or lessor is enforceable by an assignee who takes his assignment for value, in good faith, and without notice of a claim or defense, except as to defenses of a type which may be asserted against a holder in due course of a negotiable instrument under the Article on Commercial Paper. U.C.C. § 9–206 (McKinney 1964).

**22.** Our holding as to the full force and effect of the hell and high water clause as a matter of law is intended to be the law of the case on this issue. The only objection raised to the Trustee's motion to reject the 19 unassigned leases is raised by LaSalle and concerns the adequacy of protection of LaSalle's security interest in the rental payments absent full enforcement of the hell and high water clause. Accordingly, there appears to be no longer any impediment to the Trustee's motion to reject.

**23.** Local Rule 3(g) provides:

(g) Upon motion for summary judgment to Rule 56 of the Federal Rules of Civil Procedure, there shall be annexed to the notice of motion a separate, short and concise statement of the material facts as to which the moving party contends there is no issue to be tried. Failure to submit such a statement constitutes grounds for denial of the motion.

position to summary judgment[24] is that at the time these assignments of rent were made, LaSalle either knew or should have known that OPM had defaulted on payments to the Maintenance Providers. Such knowledge, either actual or imputed, is alleged by West Virginia to constitute bad faith which, under U.C.C. § 9–206(1), permits West Virginia to assert a defense to LaSalle's counterclaim for accelerated rentals.

Rule 56(e) of the Federal Rules of Civil Procedure provides in relevant part:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him.

Fed.R.Civ.P. 56(e).

LaSalle flatly denies having had any knowledge of OPM's default and any lack of good faith on its part. Rule 56(e) requires West Virginia to come forward with affirmative proof of specific facts to contradict this denial by LaSalle. As the court in *Applegate v. Top Associates, Inc.*, 425 F.2d 92 (2d Cir. 1970), stated: "To avoid summary judgment ... a plaintiff must do more than whet the curiosity of the court; he must support vague accusations and surmise with concrete particulars." *Id.* at 96. *See also Maiorana v. Mac Donald*, 596 F.2d 1072, 1080 (1st Cir. 1979); *Donnelly v. Guion* 467 F.2d 290, 293 (2d Cir. 1972); *Radio City Music Hall Corp. v. United States*, 135 F.2d 715, 718 (2d Cir. 1943). West Virginia has failed completely in presenting such concrete particulars regarding its vague and illusory allegations of bad faith and notice.

West Virginia's affidavits are utterly devoid of any specific facts establishing LaSalle's actual knowledge of OPM's default in complying with the terms of the maintenance agreement.[25] The bare assertion that a dispute exists over the state of mind of a litigant is not *ipso facto* a reason to deny summary judgment. *See Feick v. Fleener*, 653 F.2d 69 (2d Cir. 1981);

---

The papers opposing a motion for summary judgment shall include a separate, short and concise statement of the material facts as to which it is contended that there exists a genuine issue to be tried.

All material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party. Local Rule 3(g), Rules for the Southern District of New York (1980).

**24.** This Rule 56 motion was fully argued, briefed and marked "submitted" as ripe for determination by the Court on May 20, 1982. None of the parties requested leave of the court to submit post-submission papers or memoranda. Notwithstanding the consensual yield to this court's determination of a mature motion, West Virginia on June 30, 1982, more than one month after this court undertook deliberation, and six months after the original notice of motion, filed an additional affidavit with the court clerk with the apparent intention of raising belated issues of fact. The submission was without application to, or leave of, the court and is in violation of Rule 3(c)(3) of the Civil Rules of the District Court for the Southern District of New York. Accordingly, the affidavit is outside the scope of this Court's consideration.

**25.** With regard to constructive or imputed knowledge, that the Attorney General of West Virginia not only gave his approval to the content of the lease between West Virginia and OPM but also approved the assignment to LaSalle after the alleged default, militates against a finding of imputed knowledge and bad faith on the part of LaSalle. Such an imputing of knowledge cannot occur because the only circumstance which could impute bad faith is that LaSalle took the assignment two months after OPM first defaulted on its maintenance payments. This circumstance is greatly overshadowed by the Attorney General's approvals. The Court in *Credit Alliance Corp. v. David O. Crump Sand & Fill Co.*, 470 F.Supp. 489 (S.D.N.Y.1979), similarly found summary judgment in favor of an equipment lessor although knowledge of default in maintenance could have been imputed from the circumstances. The Court in *Credit Alliance* found that given actual evidence that the lessee had unequivocally acknowledged in writing the complete and satisfactory delivery of the equipment, any knowledge of default that could have been imputed circumstantially was irrelevant. *Id.* at 492.

*Markowitz v. Republic National Bank of New York*, 651 F.2d 825, 828 (2d Cir. 1981); *S.E.C. v. Research Automation Corp.*, 585 F.2d 31, 33–34 (2d Cir. 1978). "Courts, refusing to exalt form over substance, cannot be awed by procedural spectres and cannot be swayed by feigned issues." *Feick*, 653 F.2d at 77. *See also Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 445 (2d Cir. 1980); *Applegate v. Top Associates, Inc.*, 425 F.2d at 96.

■ Similarly, a general innuendo alleging bad faith which points to no particular facts on which to ground the charge is no defense to a motion for summary judgment. *See* Fed.R.Civ.P. Rule 56(e); *Applegate v. Top Associates, Inc.*, 425 F.2d at 96; *In re Carnegie Industries, Inc.*, Bkrtcy.S.D.N.Y., 8 B.R. 983, 986–87, 24 C.B.C. 39; 6 Moore's Federal Practice ¶ 56.22(1) at 1324–25 (1982). West Virginia's vague assertion that LaSalle is somehow guilty of bad faith raises no genuine issue as to any material fact to preclude summary judgment. West Virginia's pointing to the general fact that OPM was involved in pyramid schemes without specific reference and without relating such fact to LaSalle is absolutely irrelevant here. *See id.*

■ Additionally, West Virginia argues that because LaSalle had the right to inspect OPM's books and records under the LaSalle-OPM agreements, knowledge of the default to the Maintenance Providers should be imputed to LaSalle. As discussed in note 24 *supra*, this imputing of knowledge is greatly overshadowed by West Virginia's express approval of an assignment after the alleged default by OPM. In addition, this argument presupposes the existence of a duty to investigate upon the as-

signee who takes for value. *In Bankers Trust Co. v. Litton Systems, Inc.*, 599 F.2d 488 (2d Cir. 1979), a lessee of certain equipment similarly sought to impose upon the lessor's secured lender a duty to investigate into matters collateral to the assigned rental payments. In refusing to impose such a duty on the assignee, Second Circuit Judge Moore stated:

> (T)he holder in due course is protected not because of his praiseworthy character, but to the end that commercial transactions may be engaged in *without elaborate investigation of the process leading up to the contract or instrument* and in reliance on the contract rights of one who offers them for sale or to secure a loan. 599 F.2d at 494. (emphasis added) *See also* Gilmore, *The Commercial Doctrine of Good Faith Purchase*, 63 Yale L.J. 1057 (1954).

Although *Litton* involved a claim of bribery against the lessor rather than a default in a contract term as alleged herein, this rationale applies equally here.

■ Moreover, the opinion letter from the West Virginia Attorney General as to the validity of the rental payments to OPM coupled with West Virginia's execution of Consent and Agreements to the assignment to LaSalle satisfied whatever duty of inquiry LaSalle may have had insofar as OPM's obligations to West Virginia were concerned.

■ Since West Virginia has presented no specific facts demonstrating the alleged bad faith of LaSalle sufficient to defend against this motion for summary judgment under Rule 56(e), LaSalle is entitled to judgment on its claim for rent as a matter of law.[26]

---

**26.** West Virginia also attempts to raise two other kinds of factual issues in its Rule 3(g) statement and affidavits.

First, it states in conclusory terms that there is a factual issue as to whether or not LaSalle took an assignment of the net or gross rentals (including maintenance payments). However, West Virginia submits no facts to support its allegations that only net rentals were assigned to LaSalle. Indeed, the terms "gross" and "net rentals" are found in none of the agreements at

issue herein. Moreover, in each Security Agreement, OPM assigns as security "all of its estate, right, title, interest, claim and demand in . . . *the rental payments and rental installments . . . damages and other moneys* (with certain exceptions not here pertinent) from time to time payable to or receivable by OPM under the Equipment Schedules . . ." West Virginia not only received notice of these assignments, but expressly consented to them in each Consent and Agreement it executed. *See*

Accordingly, LaSalle's motion for summary judgment as to West Virginia's liability for accelerated rental payments is granted.[27] West Virginia's cross motion to dismiss the counterclaim is denied.

In addition, in view of our holding affirming West Virginia's independent, absolutely unconditional liability to LaSalle, the rejection by the Trustee of the 19 leases assigned to LaSalle has no effect upon LaSalle's remedies against West Virginia in the event West Virginia defaults. Thus, LaSalle's security interest in the lease payments is fully protected. Therefore, the Trustee's motion to reject these 19 leases is granted.

Settle an order in conformity with this opinion.

---

Camp Affidavit, Exs 9, 10 and 11. Accordingly, this court finds from the Security Agreements that gross rentals were assigned to LaSalle.

Second, West Virginia attempts to raise an issue as to the possible waiver by LaSalle of its assignment from OPM by the means of collection of the rentals. However, all parties agreed in open court at the oral argument on this Motion that they were participants in a pass-through mechanism by which West Virginia would forward checks to OPM who would then endorse them directly over to LaSalle. Thus, there can be no issue as to the waiver of the assignment by the mode of rent collection. *See* Transcript of Argument at 22–23.

27. The defense West Virginia has raised of lack of appropriations with which to pay a judgment against it is legally insufficient. LaSalle is entitled to a judgment on its counterclaim regardless of whether, as a practical matter, funds can be obtained to satisfy it.