### The PHILADELPHIA SAVINGS FUND SOCIETY
v.
### DESERET MANAGEMENT CORPORATION.

Civ. A. No. 83–6259.

United States District Court, E.D. Pennsylvania.

Oct. 23, 1985.

---

**3.** For the same reasons, John Crane will have summary judgment granted in its favor on all cross-claims by co-defendants.

Raymond K. Denworth, Jr., Drinker, Biddle & Reath, Philadelphia, Pa., for plaintiff.

Tyson W. Coughlin, Robert H. Knauss, Ballard, Spahr, Andrews & Ingersoll, Philadelphia, Pa., M. Karlynn Hinman, Kirton, McConkie & Bushnell, Salt Lake City, Utah, for defendant.

## MEMORANDUM AND OPINION

RAYMOND J. BRODERICK, District Judge.

This diversity action concerning the interpretation of a computer equipment lease agreement is before the Court on cross-motions for summary judgement. The essential dispute is whether the documents evidencing the agreement provide for a lease term of sixty full calendar months or a term of sixty months from the commencement date of the lease. The Philadelphia Savings Fund Society (PSFS), the assignee of the lessor's right to payments, brought suit against Deseret Management Corporation (Deseret), the delegatee of the lessee's duties, alleging that Deseret's failure to pay the full amount of the last monthly rental payment constitutes a default by Deseret.

The Court may grant a motion for summary judgment only if there are no genuine issues of material fact and the moving party is entitled to judgement as a matter of law. *Hollinger v. Wagner Mining & Equipment Co.*, 667 F.2d 402, 504 (3d Cir. 1981). The parties are in agreement that there are no genuine issues of material fact. For the reasons discussed below, the Court has determined that the plaintiff PSFS is entitled to judgement as a matter of law.

On or about February 28, 1978, O.P.M. Leasing Services, Inc. (OPM) as lessor entered into a computer equipment lease with Management Systems Corporation (MSC) as lessee. The agreement is evidenced in a "Master Agreement of Lease" (Master

Lease or ML) and "Equipment Schedule No. 1" (Equipment Schedule or E.S.), which is incorporated by reference into the Master Lease. Annex I to the Equipment Schedule describes the equipment subject to Equipment Schedule 1, and Annex II to the Equipment Schedule sets forth a table of Stipulated Loss Values to be considered in the event of default by MSC on Equipment Schedule No. 1.

Section 2 of the Master Lease provides that the lease term is controlled by the period during which the particular incorporated Equipment Schedule remains in effect. Section 2 also provides that the "Commencement Date" of each Equipment Schedule is the earlier of the date that MSC executed an Equipment Acceptance Form or the completion date of the equipment installation.

Further, section 2 states that the "lease term for (the) Equipment Schedule ... shall expire at the *end of the last full payment period* set forth in the Equipment Schedule."

The Equipment Schedule provides for 60 monthly payment periods. (E.S. § 2) For months 1–36, the rental payment is $41,000.00. For months 37–60, the rental payment is $39,000.00. (E.S. § 2).

The Master Lease provides that payment of rent is to take place in the following manner:

Lessee shall pay to Lessor ... the monthly rent set forth in the Equipment Schedule, which shall be due and payable in advance on the *first day of each calendar month during the term thereof.* (M.L. § 3).

The Master Lease also provides for the proration of the initial rental payment in the event the lease does not "commence" on the first day of a calendar month:

If the Commencement Date of any Equipment Schedule shall be other than the first day of the month, Lessee shall make *an initial payment* on the Commencement Date in an amount equal to one-thirtieth of the monthly rent set forth in the Equipment Schedule for each day from the Commencement Date (including the Commencement Date) through the last day of the month (including that day). (M.L. § 3)

There is no dispute that MSC executed an Equipment Acceptance Form on April 11, 1978, making that date the "Commencement Date" under the Master Lease. It is also agreed that MSC made an "initial payment" of $25,966.66 for April 1978.

Section 5.3 of the Master Lease provides that "Lessee acknowleges and understands that the term and conditions of each Equipment Schedule have been fixed by Lessor in anticipation of its being able to assign its interest under each Equipment Schedule." On May 12, 1978, PSFS entered into a security agreement with OPM in which PSFS purchased a note executed by OPM which provided for monthly payments of interest and principal. The note was secured by OPM's assignment of all of its right, title and interest in the Equipment Schedule, including the computer equipment and the rental stream thereunder, as of July 1978. At the closing of this security agreement, MSC delivered to PSFS its "Consent and Agreement" to the assignment of rights by OPM to PSFS. The Consent and Agreement provides that:

Management Systems agrees until payment in full of [the "Moneys" payable to OPM under the Equipment Schedule] (i) to remit and deliver all Moneys directly to PSFS, at the above [Philadelphia] address, without abatement, reduction, counterclaim or offset, notwithstanding any rights which Management Systems may have had or may hereafter have in the absence of this Consent and Agreement to any such abatement, reduction, counterclaim or offset pursuant to any of the terms of the Equipment Schedule or as a result of any breach of any obligation of OPM under the Equipment Schedule or as a result of any breach arising out of any action or omission of the owner of the equipment subject to the Equipment Schedule....

In February, 1980, MSC requested PSFS to approve the assignment by MSC of its rights and obligations under the Master

Lease and Equipment Schedule to Deseret, and the assumption by Deseret of MSC's rights and obligations. PSFS executed a consent to the assignment and delegation and released MSC of its obligations.

The monthly rental payments made with respect to the Master Lease and Equipment Schedule may be summarized as follows:

| DATES | PAYMENT BY | RECEIVED BY | AMOUNT |
|---|---|---|---|
| April 11, 1978 | MSC | OPM | $25,966.66 |
| May 1, 1978–<br>June 1, 1978 | MSC | OPM | $41,000/mo. |
| July 1, 1978–<br>Feb. 1, 1980 | MSC | PSFS (Pltf.) | $41,000/mo. |
| March 1, 1980–<br>March 1, 1981 | DESERET (Def) | PSFS | $41,000/mo. |
| April 1, 1981 | DESERET | PSFS | $39,733.34 |
| May 1, 1981–<br>Nov. 30, 1981 | DESERET | PSFS | No payments |
| December 1, 1981 | DESERET | PSFS | $312,000.00<br>(8 × 39,000) |
| Jan. 1, 1982–<br>March 1, 1983 | DESERET | PSFS | $39,000/mo. |

Finally, on April 1, 1983, Deseret tendered a final payment of $14,300.00 to PSFS. PSFS rejected this tender and demanded $39,000.00, which Deseret refused to pay. PSFS brought suit on the ground that Deseret defaulted on its obligation to make the 60th monthly rental payment required by the Equipment Schedule in the full amount of $39,000.00.

The first determination which the Court must make is whether or not Deseret's tender of $14,300.00 on April 1, 1983 and refusal to pay $39,000.00 constitutes a default or breach within the terms of the Master Lease and Equipment Schedule. This depends upon the length of the lease term. If the lease was to run from April 11, 1978 until April 10, 1983, as Deseret contends, the $14,300.00 payment would be justifiable as a prorated payment for April 10, 1983. However, if the lease was to run for a term of 60 full calendar months regardless of whether or not there was an initial rental period of less than a month, then Deseret's failure to make the 60th monthly rental payment in full is a breach of the lease agreement.

Section 19.05 of the Master Lease provides that the lease documents are to be construed in accordance with New York law. Both parties have taken the position that there are no conflicts between the law of Pennsylvania and the law of New York on the contract issues raised in this case.

Both PSFS and Deseret assert that the provisions in the lease documents relating to lease terms are not ambiguous. Therefore, the Court will look to the documents as the objective manifestation of the parties' intention with respect to lease terms, and will attempt to give effect to that expressed intention.

" '[T]he making of a contract depends not on the agreement of two minds, in one intention, but on the agreement of two sets of external signs—not on the parties having *meant* the same thing but on their having *said* the same thing.' " *Mellon Bank, N.A. v. Aetna Business Credit,* 619 F.2d 1001, 1009 (3d Cir.1980) (quoting Holmes, *The Path of the Law, in Collected Legal Papers* 178 (further citation omitted) (emphasis in original)). As the Third Circuit explained in *Mellon,*

"The rule enunciated in *Gianni v. Russell & Co., Inc.,* (281) Pa. 320, 126 A. 791 supra, is firmly embedded in the law of Pennsylvania and from that rule we will

not permit a deviation for it is essential that the integrity of written contracts be maintained.... 'Where parties, without any fraud or mistake, have deliberately put their engagements in writing, the law declares the writing to be not only the best, but the only, evidence of their agreement: (citing cases). All preliminary negotiations, conversations and verbal agreements are merged in and superseded by the subsequent written contract ... and unless fraud, accident or mistake be averred, the writing constitutes the agreement between the parties, and its terms cannot be added to nor subtracted from by parol evidence: (citing cases.)' " 619 F.2d at 1010 (*quoting United Refining Co. v. Jenkins*, 410 Pa. 126, 134, 189 A.2d 574, 578 (1963)). *Accord, Laba v. Carey*, 29 N.Y.2d 302, 308, 327 N.Y.S.2d 613, 618, 277 N.E.2d 641, 644 (1971). (The Court is "concern[ed] ... with the intent of the parties to the extent that they evidenced what they intended by what they wrote ... and that intent must be gleaned from the several provisions of the contract."); *Allright New York Parking, Inc. v. Shumway*, 94 A.D.2d 962, 963, 463 N.Y.S.2d 968, 970 (4th Dept.1983) (citations omitted).

■ Reading the Master Lease and Equipment Schedule together as a whole, the Court has determined that it is the expressed intention of the parties that the lease would run for 60 full calendar months beginning with May 1, 1978, and that the provision in the Master Lease for an initial payment period was intended to be in addition to the 60 month lease term provided in the Equipment Schedule. Several factors prompted this conclusion:

As stated above, the Master Lease provides that the lease term for a given Equipment Schedule is to be controlled by the effective term of that Equipment Schedule, and that the Equipment Schedule would expire at the *"end of the last full payment period"* specified therein. The Equipment Schedule involved here provided simply that the term was "60 months". The Equipment Schedule further provided the "Monthly Rental Payments" for months

1–36 and 37–60. When these provisions are read in conjunction with the Master Lease's requirement that monthly rental payments be made on the first day of each calendar month during the term (of the Equipment Schedule), the conclusion is almost inescapable that the lease was intended to run for 60 full calendar months.

The question then becomes how to reconcile this 60-month term with the "initial payment" period provided in the Master Lease. Reading the documents as a whole, the Court concludes that the basic lease term is referred to in the Master Lease and set forth in the Equipment Schedule. The Master Lease's additional reference to an "initial payment" must be deemed a payment *in addition to* the monthly payments *already provided* in the Equipment Schedule and referred to in the Master Lease. The Court must attempt to construe all of the language of written contracts so as not to render any of the terms meaningless. *Spaulding v. Benenati*, 57 N.Y.2d 418, 424, 456 N.Y.S.2d 733, 736, 442 N.E.2d 1244, 1247 (1982); *Laba v. Carey*, 29 N.Y.2d at 308, 327 N.Y.S.2d at 618, 277 N.E.2d at 644 (1971); *Corhill Corporation v. S.D. Plants, Inc.*, 9 N.Y.2d 595, 598–599, 217 N.Y.S.2d 1, 3, 176 N.E.2d 37, 38 (1961).

There is a superficial appeal to Deseret's contention that the "60 months" should begin on the "Commencement Date" and therefore the lease term expired on April 10, 1983. However, the ramifications of this interpretation are illogical. If April 11, 1978–May 10, 1978 was to be considered "Month No. 1" under the Equipment Schedule, then one would have only to refer to the Equipment Schedule to determine that the monthly rental payment due on April 11, 1978 was $41,000.00. In other words, if Month No. 1 ran from the Commencement Date, there would be no reason or need to provide for an "initial payment" period. This indicates that the initial payment was *not* a monthly rental payment but merely a preliminary rental prorated on the basis of the number of days until the first monthly rental period could begin on the next first day of the month, i.e. May 1, 1978.

Deseret's attempt to reconcile the requirement that monthly rental payments be made on the first day of the calendar month with its proposed interpretation of the lease term is based on the following contentions: Deseret contends that the fact that the parties contracted for payment to be made on the first day of the month has no relevance to the rental period to which that payment relates. Deseret interprets the initial payment provision to mean that on April 11, 1978, ⅔ of the first monthly rental payment of $41,000 was due, and that on May 1, 1978, the entire second monthly rental payment of $41,000 was due. Under Deseret's calculations, April 1981 was the *37th* month, and in that month payment was due for ⅓ month at $41,000.00 and ⅔ month at $39,000.00. Deseret thus concludes that the 60th month was March, 1983, and that the only payment due on April 1, 1983 was the ⅓ month remaining unpaid on the 37th monthly rental payment of $39,000.00.

Aside from the confusion and apparently unnecessary complication engendered by Deseret's theory, this interpretation is simply not supported by the wording of the lease documents. The parties provided at length for a calculation of the initial payment to take place in the event the Commencement Date did not fall on the first day of a calendar month. (*See* M.L. § 3 quoted above). If the parties had intended the same kind of proration to take place in the 37th and 61st months, they would certainly have made similar specific provision for it.

The maxim "expressio unis, exclusio alterius" is not inappropriate here. The manner in which full monthly rental payments 1–60 were to be made is on the first day of the calendar month. Months 1–36 and months 37–40 are most reasonably construed as *calendar* months. The only exception to this mode of payment by calendar month is the provision for an initial payment. It is obvious that this initial payment was not to have any effect on the calculation and payment of monthly rentals 37 and 60, in the absence of a specific statement to that effect.

It would have been very easy for the parties to have provided that the lease term specified in the Equipment Schedule would begin to run from the Commencement Date. The omission of such a provision and the inclusion of the initial payment provision preclude such an interpretation.

Finally and perhaps most convincingly, Annex II to the Equipment Schedule provides that the "Stipulated Loss Values" in the event of default shall depend on "the number of *full monthly rental payments (excluding any initial payment)* received under this Equipment Schedule" (emphasis added). This language creates a distinction between monthly rental payments and the initial payment and also indicates that the initial payment is in addition to monthly rental payments 1–60 under the Equipment Schedule. Indeed, Annex II lists a Stipulated Loss Value to be assigned after 60 full monthly payments (excluding any initial payment) have been made. This certainly indicates the intent that in the absence of default, 60 full monthly payments would be made in addition to any initial payment.

The Court finds that the Master Lease and Equipment Schedule are not ambiguous, and that their meaning may be discerned within their collective "four corners." Therefore, there is no need to refer to extrinsic or parole evidence such as the affidavits of the parties' officers on the subject of what they *intended* to provide or to the course of performance of the contract (including some months with no payments and two monthly payments of $39,733.34 and $312,000.00), in order to determine that meaning. *See West, Weir & Bartel, Inc.,* 25 N.Y.2d 535, 541, 307 N.Y. S.2d 449, 452, 255 N.E.2d 709, 711–712 (1969) (circumstances extrinsic to agreement will not be considered where the intention of the parties can be determined from the instrument itself) (citations omitted); *Ditmars—31 Street Development Corp. v. Punia,* 17 A.D.2d 357, 235 N.Y. S.2d 796, 800 (1967). On April 1, 1983 Deseret was obligated to make the full

monthly rental payment of $39,000.00 for April, 1983, the 60th month of the lease term. In the absence of an affirmative defense to liability, Deseret is in breach of the lease agreement.

In its first amended answer and counter-claims, Deseret raises the following affirmative defenses to liability in the form of counterclaims: (1) that a material breach by OPM after the assignment to PSFS justified Deseret's nonpayment of rent to PSFS, and (2) that a letter agreement was entered between PSFS and Deseret on December 21, 1981 which constitutes a waiver of PSFS' right to demand payment in full without respect to Deseret's claims against OPM for breach. These defenses will be considered in turn.

■ Deseret alleges that in 1981, it notified OPM that it was exercising the "Special Sublease Option" provided in Section 5(a) of the Equipment Schedule. Section 5(a) provides that after 36 full monthly payments have been made under the Equipment Schedule, upon notice to the Lessor,

Lessee shall have the option ... to cause Lessor to enter into a sublease of the Equipment pursuant to an agreement of sublease ... between Lessee, as sublessor, and Lessor, as sublessee, containing terms and conditions substantially identical to those contained in this Equipment Schedule.... [and further providing] for a monthly rental (the "Special Sublease Rental") equal to the monthly rental payment provided for herein, which Special Sublease Rental shall be paid by Lessor each month directly to Lessor's assignee....

Deseret alleges that OPM refused to take possession of the rental equipment or to assume the remaining rental payments due to PSFS under the Equipment Schedule. OPM filed a petition in bankruptcy on March 11, 1981. Deseret alleges that OPM's breach of the Master Lease and Equipment Schedule excused Deseret from further performance of any obligation owing to OPM or to PSFS. Therefore, Deseret claims it is entitled to a refund of the amounts it paid to PSFS on and after December, 1981.

PSFS does not dispute the allegations that OPM breached its obligation to Deseret by refusing to honor Deseret's exercise of the Special Sublease Option. However, PSFS asserts that OPM's breach is irrelevant to this action because of the so-called "hell or high water" provisions in the Master Lease:

Lessee acknowledges and understands that the terms and conditions of each Equipment Schedule have been fixed by Lessor in anticipation of its being able to assign its interest under each Equipment Schedule.... Lessee covenants and agrees that:

. . . . .

(ii) Any such assignee shall not be obligated to perform any of the obligations of Lessor under any Equipment Schedule other than Lessor's obligation not to take any action to disturb Lessee's quiet and peaceful possession of the Equipment ...".

(iii) *Lessee's obligation to pay directly to such assignee the amounts due from Lessee under any Equipment Schedule ... shall be absolutely unconditional* and shall be payable whether or not any Equipment Schedule is terminated by operation of law, any act of the parties or otherwise.

(iv) *Lessee shall pay all amounts due from Lessee under any Equipment Schedule ... to such assignee, notwithstanding any defense, offset or counterclaim whatever*, whether by reason of breach of such Equipment Schedule or otherwise which it may or might now or hereafter have as against Lessor (Lessee reserving its right to have recourse directly against Lessor on account of any such counterclaim or offset) .... (M.L. § 5) (emphasis added).

The bankruptcy court for the Southern District of New York has held that language identical to this in a similar OPM lease effectively entitled OPM's assignee to recover rental payments from the lessee despite OPM's material breach in the per-

formance of his retained duties. *West Virginia v. Hassett (In re OPM)*, 21 B.R. 993, 1005–08 (Bankr.S.D.N.Y.1981) (citing *Breed v. Insurance Co. of North America*, 46 N.Y.2d 351, 413 N.Y.S.2d 352, 385 N.E.2d 1280 (1978); *Laba v. Carey*, supra; *Luna Park Housing Corp. v. Besser*, 38 A.D.2d 713, 329 N.Y.S.2d 332 (2d Dept.1972). The bankruptcy court further held that the hell or high water clause made the lessee's allegations, that the lessor's assignee took the assignment in bad faith with knowledge of claims and defenses, irrelevant and did not preclude the entry of summary judgment in favor of the lessor's assignee. 21 B.R. at 1008.

The court stated,

[C]ourts have uniformly given full force and effect to "hell and high water" clauses in the face of various kinds of defaults by the party seeking to enforce them. *National Equipment Rental v. J & I Carting, Inc.*, 73 A.D.2d 666, 423 N.Y.S.2d 205 (2d Dept.1979); *Dixie Groceries, Inc. v. Albany Business Machines*, 156 Ga.App. 36, 274 S.E.2d 81, 83 (1980). *See also First National Bank of Atlanta v. Harrison*, 408 F.Supp. 137, 140 (N.D.Ga.1975), *aff'd*, 529 F.2d 1350 (5th Cir.1976).

The courts in all of the above cited cases held that clauses containing unconditional promises are strictly enforceable as a matter of law. In so doing, they have found summary judgment in favor of the lessor or its assignee because no facts submitted by the lessor opposing summary judgment are in any way relevant to the lessee's unequivocal liability based on these hell and high water provisions.

.   .   .   .   .   .

The essential practical consideration requiring liability as a matter of law in these situations is that these clauses are essential to the equipment leasing industry. To deny their effect as a matter of law would seriously chill business in this industry because it is by means of these clauses that a prospective financier-assignee of rental payments is guaranteed meaningful security for his outright loan to the lessor.... *See* [R] *Contino, [Legal and Financial Aspects of Equipment Leasing Transaction,* 29,] 87; B. Fritch and A. Reitman, *Equipment Leasing—Leveraged Leasing,* 131–32 (1977).

In both the bankruptcy case and in this case, the lease documents include extensive provisions ensuring the assignability of OPM's right to payments, providing that OPM retained the sole obligation to perform the lessor's duties, and assigning to the lessee the sole obligation to make rental payments to the lessor's assignee irrespective of the lessor's breach. *See* 21 B.R. at 999–1000; (M.L. §§ 5.3(1)–(iv)).

Like the lessee in *West Virginia v. Hassett*, the lessee here "was well aware of this unconditional right to payment of rentals when it executed the Consent and Agreement to take the assignments by OPM to (PSFS)." 21 B.R. at 1006. In fact, even the Special Sublease Option provides that the lessee remains obligated to pay monthly rental payments until they are actually received by the lessor's assignee and that in the event of a default by lessor (sublessee), the lessee's remedies are limited to regaining possession of the Equipment and suing lessor by an independent action. (M.L. § 5(a)).

This Court finds the opinion of the bankruptcy court in *West Virginia v. Hassett* well-reasoned and well-supported and agrees that "[t]o deny this clause its full force and effect would effectively reconstruct the contract contrary to the intent of the parties, which reconstruction would be impermissible." 21 B.R. at 1006 (citing *Rodolitz v. Neptune Paper Products, Inc.*, 22 N.Y.2d 383, 386, 239 N.E.2d 628, 630, 292 N.Y.S.2d 878, 881 (1968)). Deseret asserts that the effect of the hell or high water clause was simply to predetermine which party should hold the rental money in the event of a dispute. For the reasons heretofore set forth, the Court rejects this suggestion.

Next, Deseret contends that a letter mailed with a rental payment check to plaintiff's counsel on December 21, 1981 constitutes a waiver by PSFS of its rights under the hell and high water provisions. The portion of the letter relied upon by Deseret provides,

> You are authorized to deliver this check to PSFS and PSFS is authorized to negotiate the same only upon the Bank's written acceptance of the following terms.
>
> .    .    .    .    .
>
> 1.  It is understood that Deseret believes OPM to be in default of its obligations under the lease agreement and to have fraudulently induced (Deseret) and its predecessor, Management Systems Corporation, to enter into the lease agreement, thus relieving any obligation of [Deseret] to OPM thereon.
>
> .    .    .    .    .
>
> 3.  It is understood and agreed that although DMC is not presently aware of grounds relieving it of responsibility it will continue to investigate the circumstances and facts surrounding the financing of this lease and the administration thereof, it being agreed by PSFS that in the event it is found or determined by a court of law or by any other acceptable means that DMC is not liable for such payments it will refund the amounts paid together with appropriate interest.

*See* First Amended Answer and Counterclaim at 5.

On December 31, 1981, counsel for PSFS signed this letter indicating PSFS' acceptance of the terms set forth. The Court is at a loss to understand how the above-quoted language constitutes a waiver by PSFS of its right to insist on payment despite a breach by OPM. The language is nothing more than an acknowledgement by PSFS that Deseret is making the payment under protest and reserving its right to later contest the obligation in a court of law "or by other acceptable means," (whatever the latter may mean). PSFS agrees only that it will refund the payments with interest in

the event of a determination that Deseret was not obligated to make the payment. In the event this determination were to be made by a court, it is hard to see what PSFS has given up which it would not be required to do by the Court's order.

Deseret's waiver argument apparently depends upon its previous argument that the hell or high water provisions are not effective and that OPM's breach relieved Deseret of its obligation to pay rent to PSFS. This Court has already determined that the hell or high water provisions are fully enforceable and that OPM's alleged breach is not a bar to summary judgement in favor of PSFS.

Having determined that PSFS is entitled to summary judgement, the Court must proceed to determine the amount of that judgement. PSFS cites section 12.1(a) of the Master Lease, which defines "[d]efault by Lessee in the payment of any installment of rent or other charge payable by Lessee under such Equipment Schedule, as and when the same becomes due and payable" as an "Event of Default." PSFS seeks to recover under section 12.2 of the Master Lease, which is captioned "Remedies" and which provides as follows:

> "12.2 *Remedies. Upon the occurrence of any one or more Events of Default, Lessor, at its option, may* (1) proceed by appropriate court action or actions either at law or in equity to enforce performance by Lessee of the applicable covenants and terms of the applicable Equipment Schedule and/or to recover from Lessee any and all damages and expenses, including reasonable attorneys' fees, which Lessor shall have sustained by reason of Lessee's default in any covenant or covenants of such Equipment Schedule or on account of Lessor's enforcement of its remedies thereunder, and/or (2) *without notice or demand, accelerate the balance of the rentals thereafter accruing under such Equipment Schedule, which, after giving effect to a discount thereon at a rate which will result in an amount equal to the then Stipulated Loss Value set*

*forth in Annex II of such Equipment Schedule, shall become immediately due and payable, together with all rent and other amounts then due and payable (assuming no acceleration), and Lessor shall have the right to the extent permitted by law:* (i) to recover all sums so due under such Equipment Schedule; (ii) to retake immediate possession of such Equipment without any process of law and for such purpose Lessor may enter upon premises where such Equipment may be located and may remove the same therefrom without notice, and without being liable to Lessee therefor, except that Lessor shall be liable for damages resulting from the willful or negligent acts of Lessor in any such entry or repossession; (iii) *to sell,* lease or otherwise dispose of all or any portion of such Equipment, with the privilege of becoming the purchaser thereof, at public or private sale, for cash or on credit and with reasonable written notice of its intention to do so or of its doing so, *in which event* Lessor shall apply the proceeds of any such transaction, less all costs and expenses incurred in connection with the recovery, repair or storage of the Equipment or the transaction itself, against all sums due from Lessee and to the extent and in the manner permitted by law, Lessee shall be liable to Lessor for, and Lessor may recover from Lessee, the amount by which the proceeds of any such transaction, less the expenses of retaking, storing and repairing the Equipment and transaction itself, including reasonable attorneys' fees incurred by Lessor, is less than all sums then due from Lessee under such Equipment Schedule (assuming no acceleration) plus the then Stipulated Loss Value set forth in Annex II of such Equipment Schedule and recover from Lessee the sum of the amount then due Lessor under the Equipment Schedule terminated and the rental payments and other amounts due during the remaining terms thereof; and (v) to pursue any other remedy permitted by law or equity. The above remedies, to the extent permitted by law, any one of which Lessor need not, in its discretion, exercise, shall be deemed cumulative and may be exercised successively or concurrently. *Lessee shall reimburse Lessor for all costs and expenses incurred in connection with the enforcement of any right or remedy under any or all Equipment Schedules, including reasonable attorneys' fees."* (emphasis added).

Annex II to the Equipment Schedule lists the following Stipulated Loss Values:

| If the number of full monthly rental payments (excluding any initial payment) received under this Equipment Schedule is: | The Stipulated Loss Value Shall Be: |
|---|---|
| 0 | $2,330,337.53 |
| ... | ... |
| 30 | $1,187,337.61 |
| ... | ... |
| 59 | $ 75,523.06 |
| 60 | $ 61,012.52 |

(emphasis added). Based on the above provisions, PSFS seeks to recover $114,523.06 ($75,523.06, Stipulated Loss Value after 59 monthly payments, plus $39,000.00, April 1983 monthly rental payment) plus interest at 12% from April 1, 1983, plus its costs and collection expenses, including attorney's fees. Deseret contends that PSFS' failure to mitigate damages is a bar to recovery, that the Stipulated Loss Value provisions are inapplicable to this situation, and that the Stipulated Loss Value is an unenforceable penalty.

The Court agrees with Deseret that PSFS is not entitled to recover the Stipulated Loss Value, because the optional remedy provided in Section 12.2(2) is not applicable under the circumstances of this case. That section provides that "[u]pon the occurence of ... [an] Event[ ] of Default, Lessor ... may ... (2) ... *accelerate the balance of the rentals thereafter accruing,"* discount the accelerated rentals in accordance with the Stipulated Loss Value Table, and recover the amount of the Stipulated Loss Value, "together with all rent and other amounts then due and payable." There is no question that the dispute in this

case concerned the final monthly payment which accrued on April 1, 1983. Although there was a default on that date in the failure to make full payment, there were no "rentals thereafter accruing," because this was to be the last month of the lease term. Because there were no subsequently accruing rentals, the acceleration clause is not triggered, there are no accelerated rentals to discount, and there is no reason to arrive at the Stipulated Loss Value.

PSFS contends that the Stipulated Loss Value is a liquidated damages provision which may be recovered even after 59 or 60 full monthly payments have been made. PSFS relies on the fact that the Stipulated Loss Value Table in Annex II provides a Stipulated Loss Value after 59 full monthly payments, and even after 60 full monthly payments. PSFS argues that Section 12.-2(2) provides a remedy based on the Stipulated Loss Value in the present situation of a default on the final payment, which had already accrued at the time of the default. In the event the Court accepted PSFS' construction of Section 12.2, under the circumstances of this case, Section 12.2 would appear to operate as a penalty rather than as a liquidated damages clause.

New York law relating to the enforcement of a liquidated damages provision is "well settled":

"A contractual provision fixing damages in the event of breach will be sustained if the amount liquidated bears a reasonable proportion to the probable loss and the amount of actual loss is incapable or difficult of precise estimation (*Truck Rent-A-Center v. Puritan Farms 2nd, Inc.*, 41 N.Y.2d 420, 425, 393 N.Y.S.2d 365, 361 N.E.2d 1015; *National Telecanvass Associates, Ltd. v. Smith*, 98 A.D.2d 796, 470 N.Y.S.2d 22)). It is also well established that in determining whether a contractual provision constitutes liquidated damages or a penalty, the contract is to be interpreted as of the date of its execution, not the date of its breach. Thus, the court must look to the

anticipated loss discernible at the time of contracting and not the actual loss incurred by the breach to determine whether liquidated damages are capable of calculation (*City of Rye Public Serv. Mut. Ins. Co.*, 34 N.Y.2d 470, 358 N.Y.S.2d 391, 315 N.E.2d 458; *National Telecanvass Associates, Ltd. v. Smith, supra; cf.* Uniform Commercial Code, § 2–718, subd. (1), par. (a); *Equitable Lbr. Corp. v. IPA Land Dev. Corp.*, 38 N.Y.2d 516, 381 N.Y.S.2d 459, 344 N.E.2d 391). Further, any reasonable doubt as to whether a provision constitutes an unenforceable penalty or a legitimate liquidated damages clause should be resolved in favor of a construction which holds the provision to be a penalty (*National Telecanvass Associates, Ltd. v. Smith, supra* ). Where the contract containing the liquidated damages clause for its breach contains numerous covenants of varying degrees of importance, if the loss which might be anticipated as resulting from a breach of even the least of them is disproportionate to the amount of liquidated damages, or if the loss which might result from a breach of any one of the covenants is readily ascertainable, then the clause will be held to be a penalty and unenforceable (*Seidlitz v. Auerbach*, 230 N.Y. 167, 129 N.E. 461; *Callanan Road Improv. Co. v. Colonial Sand & Stone Co.*, 190 Misc. 418, 72 N.Y.S.2d 194; 36 N.Y.Jur.2d, Damages, § 162; 34 N.Y. Jur., Landlord and Tenant, §§ 330–332).

*Vernitron Corporation v. CF 48 Associates*, 104 A.D.2d 409, 409–410, 478 N.Y. S.2d 933, 934 (2d Dept.1984).

If PSFS had received full performance from Deseret, PSFS would have received $39,000.00 on April 1, 1983. The failure to receive that performance is the only loss caused by Deseret's default. The loss suffered by PSFS is disproportionately less than the amount of liquidated damages it claims it may recover under section 12.2.

PSFS asserts that the Stipulated Loss Value is intended as damages for the re-

capture of investment tax credits which would take place upon disposition of the collateral. The Court has reviewed the Master Lease and the Equipment Schedule and has found no mention whatsoever of investment tax credits or recapture. If the parties wanted to protect OPM's and/or PSFS' investment tax credits, they should have so provided.

PSFS further contends that the Stipulated Loss Value includes reimbursement for PSFS' attorneys' fees, costs of collection, and the amount of principal and interest remaining on OPM's note. However, in this lawsuit, PSFS has requested as damages the Stipulated Loss Value *plus* the April 1, 1983 rental payment *plus* PSFS' costs and attorneys' fees. The last sentence of section 12.2 of the Master Lease expressly provides for recovery of counsel fees and costs by the Lessor, independent of the provisions relating to Stipulated Loss Value. To allow PSFS to recover both the Stipulated Loss Value, which PSFS seeks to justify as including attorneys' fees, and to recover attorneys' fees under section 12.2 would clearly constitute a "double dip."

■ The Court has determined that PSFS is entitled to recover the unpaid rental of $39,000.00 together with interest at 12% from April 1, 1983, and its attorney's fees. PSFS is ordered to provide the Court with an affidavit setting forth in detail the name(s) of the attorney(s) who did work in connection with the prosecution of this lawsuit, the dates on which such work was performed, the hourly rate(s) of each attorney at the time the work was performed, and an explanation of the type of work performed.

For the reasons heretofore set forth, summary judgement is entered in favor of PSFS in its claim against Deseret. Further, summary judgement is entered against Deseret on its counterclaims, and Deseret's motion for partial summary judgement is denied.