## DeLage Landen Financial Services, Inc. v. Intentional Camping, Inc.

---

37. Pl.'s Memo Op. Defs.' Mot. Summ. J. p. 28.

C.P. of Chester County, No. 2012-13201

*Allison L. Domowitch*, for plaintiff.
*Russell S. Burnside*, for defendant.

TUNNELL, *J.*, December 19, 2013—

## ORDER

And now, this 19th day of December, 2013, after consideration of the parties' briefs and following oral argument held December 4, 2013, the motion of plaintiff DeLage Landen Financial Services, Inc. for summary judgment is granted;

Judgment is entered in favor of plaintiff, DeLage Landen Financial Services, Inc., and against defendant, Intentional Camping, Inc., t/a/ Pine Grove Day Camp, as follows:

Past due/billed payments $6,708.90

Late Charges 305.00

Remaining Payments and Booked Residual 18,289.25

Value discounted at 3%

Interest Accrued at 18% from 01/20/2010 13,164.57

(Date of Default) until 12/10/2010

Attorneys' fees 5,836.50

Court Costs 161.00

Totaling $44,465.22, with interest, until paid.[1]

---

1. In this case for breach of contract, plaintiff, DeLage Landen Financial Services, Inc. (hereinafter "DLL"), has moved the court for the entry of summary judgment in its favor.

A review of the record discloses the following undisputed facts. Pursuant to a written lease agreement, DLL financed the lease of a Toshiba photocopier which was delivered to the defendant's premises in Wall Township, New Jersey in February 2007. The Lease Agreement was signed by "Charles Malzman, Director, Pine Grove Day Camp" (Complaint and Answer, ¶¶1-5).

A document entitled "Delivery and Acceptance" dated March 6, 2007 was signed by "Charles Malzman, Director/Owner, Pine Grove Day Camp" (Complaint and Answer, ¶6).

The lease called for the payment of $570.00 over 60 months (Complaint, ex. A). Defendant, Intentional Camping, Inc., t/a Pine Grove Day Camp (hereinafter "the Camp") has admitted that it has failed to make those payments (Answer, ¶8).

The Camp's chief defense is that Malzman did not have the authority to enter into this lease on behalf of Intentional Camping, Inc., a fact which it is averred, "was known to plaintiff and/or plaintiff's agents and/or employees at the time the lease agreement was signed" (Answer — Sixth Separate Defense).

In short, it is the Camp's position that no valid contract between it and plaintiff arose in the first instance because Malzman had neither actual nor even apparent authority to sign the document.

DLL moved for summary judgment on June 26, 2013. It contended that the Camp had admitted all facts necessary to hold it liable to the plaintiff under the Uniform Commercial Code, 13 Pa. C.S.A. §2A407. Indeed, there is no dispute that DLL is in possession of a signed contract, that goods were shipped and money lent under that contract, and that the goods were not rejected. DLL also contended that the Camp had "effectively ratified" the contract (Plaintiff's Memorandum of Law, p. 2).

The Camp filed a response to the motion for summary judgment, and an affidavit signed by its owner, director, president and treasurer, Jonathan Gold. Gold's affidavit yields additional facts of which the following are useful. His organization operates a Pine Grove Day Camp in Wall Township, New Jersey (Affidavit of J. Gold, ¶¶1-5). Malzman was an employee there. His title was "camp director" (*Id.*, ¶6). Malzman was not authorized to enter into any contracts for over $1,000.00 (*Id.*, ¶7). After Gold learned about this lease agreement, in August 2007, he fired Malzman but he did not then take any steps to try to rescind the contract "based on my assumption that the copy machine was operable"

(*Id.*, ¶10).

According to defendant's memorandum of law in opposition to plaintiff's motion for summary judgment, the Camp continued to use the photocopier until January 2010 when it notified DLL it would no longer be making payments (Defendant's Memorandum of Law, p. 2).

This is 29 months after Malzman was fired.

DLL claims that it is owed damages for lease payments beginning January 20, 2010, plus interest at the contract rate of 18%, through December 10, 2012. Added to this are certain past due amounts and late charges. DLL seeks attorneys' fees in the amount of $9,616.93, which is calculated as a 25% contingency fee. The total damages claimed are $48,245.65.

The kind of contract involved in this case is a finance lease. As such, it is governed by the Uniform Commercial Code. Pennsylvania has adopted article 2A of the U.C.C. The lease at issue here affirms as much in paragraph 20: "YOU agree the Lease is a Finance Lease as that term is defined in article 2A of the Uniform Commercial Code."

The U.C.C. at 13 Pa. C.S. §2A407(a) states, in pertinent part, that "the lessee's promises under the lease contract become irrevocable and independent upon the lessee's acceptance of the goods." 13 Pa. C.S. §2A407(b) further states that the lease agreement "is not subject to cancellations, termination, modification, repudiation, excuse or substitution without the consent of the party to whom the promise runs."

The reason for the strict enforcement of the lessee's promise to pay is due to the fact that in finance lease arrangements the leasing company is usually a financial institution that does not manufacture, distribute, or maintain an inventory of equipment, but merely provides the financing with which to purchase equipment which has already been selected by the lessee from an independent vendor. *Nath v. Nat'l Equip. Leasing Corp.*, 497 Pa. 126, 132, 439 A.2d 633, 636 (1981). The comment to section 2A103 elaborates on the roles of the parties to a finance lease:

A finance lease is the product of a three party transaction. The supplier manufactures or supplies the goods pursuant to the lessee's specification, perhaps even pursuant to a purchase order, sales agreement or lease agreement between the supplier and the lessee. After the prospective finance lease is negotiated, a purchase order, sales agreement, or lease agreement is entered into by the lessor (as buyer or prime lessee) or an existing order, agreement or lease is assigned by the lessee to the lessor, and the lessor and the lessee then enter into a lease or sublease of the goods. *Due to the limited function usually performed by the lessor, the lessee looks almost entirely to the supplier for representations, covenants and warranties.* If a manufacturer's warranty carries through, the lessee may also look to that. Yet, this definition does not restrict the lessor's function solely to the supply of funds; if the lessor undertakes or performs other functions, express warranties, covenants and the common law will protect the lessee.

\* \* \*

> *Subsection (i) requires the lessor to remain outside the selection, manufacture and supply of the goods*; that is the rationale for releasing the lessor from most of its traditional liability. The lessor is not prohibited from possession, maintenance or operation of the goods, as policy does not require such prohibition. To insure the lessee's reliance on the supplier, and not on the lessor, subsection (ii) requires that the goods (where the lessor is the buyer of the goods) or that the right to possession and use of the goods (where the lessor is the prime lessee and the sublessor of the goods) be acquired in connection with the lease (or sublease) to qualify as a finance lease.

13 Pa.C.S.A. § 2A103(a) Comment (emphasis added).

Needless to say Article 2A is not lessee-friendly.

Neither is this lease agreement. Among its terms and conditions, in paragraph 2 is the following:

> "YOUR obligation to pay the Lease Payments and your other Lease obligations are absolute, unconditional and are not subject to cancellation, reduction, setoff or counterclaim."

In the finance lease industry, this provision is referred to as a "hell or high water" provision. It provides essentially that the defendant must pay the plaintiff "come hell or high water" because the plaintiff does not manufacture, sell or select the equipment but is merely providing the financing which enables the defendant to acquire use of the equipment. The validity of "hell and high water" provisions have been repeatedly upheld by the majority of courts nationwide including, but not limited to, those of Pennsylvania. *See In re: First Interregional Advisers Corp.*, 218 B.R. 722 (Bankr. N.J. 1997); *see also AT&T Credit Corp. v. Transglobal Telecom Alliance*, 966 F. Supp. 299 at 302 (D. N.J. 1997); *See also AT&T Credit Corp. v. Zurich Data Corp.*, 37 F. Supp. 2d. 367 at 371 (D. N.J. 384, 392, 375 A.2d 1216 (App. Div. 1977). The Pennsylvania Superior Court in *U.S. Leasing Corp. v. Stephenson Equip. Inc.*, 230 Pa. Super. 181, 326 A.2d 472 (1972) upheld a "hell-or-high-water" lease provision in a suit to recover payments due under a lease. A federal court in Pennsylvania concurred when it stated that "hell-or-high-water" clauses are "essential" to the equipment leasing industry, and to deny their effect would "seriously chill business in this industry..." *Philadelphia Sav. Fund Soc'y. v. Deseret Management Corp.*, 632 F. Supp. 129, 136 (E.D. Pa. 1985). They are as such strictly enforceable as a matter of law. *Id.* In New York, the court likewise upheld UCC Section 2A-407 and "hell and high water" clauses in the case of *G.E. Capital Corp. v. Nat'l Tractor Trailer School, Inc.*, 667 N.Y.S. 2d 614, 36 U.C.C. Rep. Serv. 2d 749 (1997).

Against this backdrop, then, the court is called upon to determine whether summary judgment is appropriate.

Pennsylvania Rule of Civil Procedure 1035.2 provides that:

> After the relevant pleadings are closed, but within such time as not to unreasonably delay trial, any party may move for summary judgment in whole or in part as a matter of law.
>
> (1) whenever there is no genuine issue of any material fact as to a

necessary element of the cause of action or defense which could be established by additional discovery or expert report, or

(2) if, after the completion of discovery relevant to the motion, including the production of expert reports, an adverse party who will bear the burden of proof at trial has failed to produce evidence of facts essential to the cause of action or defense which in a jury trial would require the issues to be submitted to a jury.

The rule next following, Pa. R.C.P. 1035.3 makes clear that "the adverse party may not rest upon the mere allegations or denials of the pleadings but must file a response . . . identifying (1) one or more issues of fact arising from evidence in the record controverting the evidence cited in support of the motion or from a challenge to the credibility of one or more witnesses testifying in support of the motion, or (2) evidence in the record establishing the facts essential to the cause of action or defense which the motion cites as not having been produced.

The non-moving party can no longer merely establish the existence of a genuine issue of material fact, but rather must come forward with the evidence that would support his or her *prima facie* cause of action. Summary judgment should be granted when, after examining the record in favor of the non-moving party, there is no genuine issue of material fact and the moving party clearly establishes an entitlement to judgment as a matter of law. *Pennsylvania State Univ. v. County of Centre*, 532 Pa. 142, 615 A.2d 303 (1992).

Here, where the main defense is that Malzman "was not authorized" and that "this information was known to plaintiff", the Camp is attempting to negate apparent authority. The lease and its signature block looks for all the world to be ordinary and regular. An agent's apparent authority can be negated where it is shown that the person with whom the agent dealt did not reasonably believe the agent possessed the requisite power. *See Revere Press, Inc. v. Blumberg*, 431 Pa. 370, 375 (1968). On this point, the Camp bears the burden of proof. The Camp has, however, done no more than to affirm the prior denials in its pleadings. The Camp has not offered any evidence to support this defense. Consequently, it appears that it has nothing from which a jury could return a verdict in its favor. Trial would be a useless exercise and a waste of expense.

Moreover, as DLL has argued, even if the Camp was deceived by the conduct of Mr. Malzman in signing a contract as to which he was not authorized, after Mr. Gold's discovery of that fact, the Camp used the photocopier for some 29 months, and made payments along the way. Pennsylvania courts have endorsed the concept of ratification by a principal of conduct earlier undertaken by an agent. *See, e.g., Olvier v. City of Clairton*, 374 Pa. 333, 98 A.2d 47 (1953); *Bell v. Scranton Trust Co.*, 282 Pa. 562, 128 A. 494 (1925); *see also Ebasco Serv., Inc. v. Penn. Power & Light Co.*, 460 F. Supp. 163, 203-04 (E.D. Pa. 1978). The Pennsylvania Supreme Court has cited favorably to Section 82 of Restatement of Agency (Second). *Savidge v. Metropolitan Life Ins. Co.*, 380 Pa. 205, 209, 110 A.2d 730 (1955). Ratification of the acts of an agent may be either expressed or implied. *E.g., In re Packer Ave. Assoc.*,

1 B.R. 286, 292 (Bankr. E.D. Pa. 1979), *In re Be-Fit Health & Racquet, Inc.*, 9731273F, 1997 WL 34726325 (Bankr. E.D. Pa. Nov. 4, 1997).

Whether or not the employee, as agent of the Camp, had actual or apparent authority to bind the Camp is no longer decisive given the undisputed facts. The Camp ratified the finance lease even if its original execution was unauthorized. A very similar case occurred recently in our sister state of New Jersey. In an unreported position, *De Lage Landen Fin. Serv. v. St. Bernard's Episcopal Church*, 2012 WL 489149 (2012), the assistant to the rector of the defendant church executed a five year lease for a photocopier. He did not have the approval of the vestry to do so. The copier was delivered and installed and was used in plain view for the church's work for some 26 months. The church made the payments until that time. Applying Illinois law, the Superior Court of New Jersey, Appellate Division, held that an implied ratification of an agent's unauthorized transaction can be found where the principal knows about the transaction and retains its benefits. In that case, it was determined that the church could not repudiate the contract halfway through its term. As a result, the court determined that it need not address whether the rector's assistant had either actual or apparent authority.

This court does not cite the New Jersey court's opinion for any precedential effect, but merely to point out the similarity of facts. Applying Pennsylvania law, there would be no difference in the outcome in that case, and none in this.

The Camp has not met its burden. In entering summary judgment, the court relies on no credibility determinations whatsoever, and upon no more than the undisputed facts set out above, and the applicable law. Consequently the Nanty-Glo rule is not offended. *See, Nanty-Glo v. American Surety Co.*, 309 Pa. 236, 163 A. 523 (1932) (summary judgment may not be granted when based solely upon the oral testimony of the moving party).

The Parties' Lease Did Not Require DLL to Mitigate Damages.

The Camp argues that because there is a dispute between the parties as to whether DLL mitigated its damages, summary judgment is not appropriate. Although neither party has provided the court with any Pennsylvania case law addressing the issue of mitigation in the context of a "finance lease" governed by Article 2A (as was the Lease in this case), the court, upon review of the contract terms and Pennsylvania case law on the issue of mitigation, concludes that summary judgment is appropriate.

Pursuant to article 2A of the U.C.C. as adopted in this Commonwealth, parties to a lease are free to agree to terms that are then binding upon them. Article 2A provides that "[e]xcept as otherwise provided in this article, a lease contract is effective and enforceable according to its terms between the parties, against purchasers of the goods, and against creditors of the parties." U.C.C. § 2A-301, 13 Pa.C.S.A. §2A301. Paragraph 15 of the lease provides DLL with a variety of remedies upon default by the Camp. (Summ. J. Mot. at Ex. C. ¶15). It provides that in the case of default, DLL *may* require the Camp to return the leased equipment

or if it refuses, repossess it. (*Id.*). The Camp's suggestion that their letter demanding that DLL come and pick up the copier demonstrates a failure by DLL to mitigate its damages is not supported by the contract's language. (Resp. to Summ. J. Mot. at Ex B). Under the lease, it was the Camp that was required to return the equipment in the event of default; it was never DLL's obligation to repossess the copier. DLL obligated itself only to credit the proceeds of any sale if it sold the copier following repossession, which the lease does not require it to do. The lease by its terms makes these remedies optional, not mandatory, for DeLage. (*Id.*). *See also General Elec. Capital Corp. v. Nat'l Tractor Trailor School, Inc.*, 667 N.Y.S. 2d 614 (N.Y. Sup. Ct. 1997)(holding lessor was not required to mitigate damages under terms of finance equipment lease covering copying machine).

Even if the court were to ignore the contract's clear language and apply common law principles of mitigation to these facts, summary judgment would still be appropriate. Pennsylvania courts, while acknowledging the concept of avoidable consequences or mitigation of damages in the appropriate context, also recognizes that both parties play a role when it comes to damages. In Pennsylvania, "an injured party . . . is not obligated to mitigate damages when both it and the liable party have an equal opportunity to reduce damages." *Truserv Corp. v. Morgan's Tool and Supply Co.*, 614 Pa. 549, 39 A.3d 253 (2012)(citing *Sommerset Cmty. Hosp. v. Mitchell*, 685 A.2d 141 (Pa. Super. 1996) (holding breaching party could have reduced the amount of contractual interest to which party was entitled by paying invoices in a timely manner). The Camp had an equal opportunity to mitigate its damages in this case but failed to do so.

DLL Is Entitled to Reasonable Attorneys' Fees Pursuant to the Parties' Contract.

"[Pennsylvania] has consistently followed the general, American rule that there can be no recovery of attorneys' fees from an adverse party, absent an express statutory authorization, a clear agreement by the parties or some other established exception." *DeLage Landen Fin. Serv. v. Rozentsvit*, 939 A.2d 915, citing *Merlino v. Del. County*, 556 Pa. 422, 425, 728 A.2d 949, 951 (1999). The burden of proving entitlement to attorneys' fees is on the party claiming such entitlement. *Dep't. of Transp. v. Smith*, 145 Pa. Commw. 164, 169 (1990), *petition for allowance of appeal denied*, 613 A.2d 499 (Pa. 1992).

DLL requests an award of attorneys' fees pursuant to a fee-shifting contractual provision agreed to by the parties. (Summ. J. Mot. at ¶ 10). The lease agreement between the parties states the following in paragraph 15:

REMEDIES: WE have the following remedies if YOU are in default of this Lease: . . .

You are also required to pay (i) all expenses incurred by US in connection with the enforcement of any remedies . . . and (ii) reasonable attorneys' fees.

(Summ J. Mot. at Ex. C.)

In response to DLL's assertion that it is entitled to attorneys' fees pursuant to the lease agreement, the Camp admits that there is a Lease agreement between the parties and simply counters that the lease "speaks for itself." (Resp. Summ. J. Mot. at ¶ 10).

The Lease term relating to attorneys' fee is plain and unambiguous. Either DLL prevails on its claim of default and is entitled to reasonable attorneys' fees, or the Camp prevails and DLL is not entitled to attorneys' fees. An award of attorneys' fees (including amount) is therefore an issue to be resolved on the basis of the judgment entered. *DeLage Landen Fin. Serv.,* 939 A.2d at 924. Having found the Camp to be in default of the Lease, the court may now award DLL attorneys' fees.

As for the amount of those fees, DLL is entitled to "reasonable" attorneys' fees pursuant to the contract's terms and Pennsylvania law. *See McMullen v. Kutz,* 603 Pa. 602, 615 (2009). Determination of the reasonableness of an attorneys' fee award is within the sound discretion of the trial court and is reviewed only for abuse of discretion. *LaRocca Estate,* 431 Pa. 542, 246 A.2d 337 (1968); *Thompson Estate,* 426 Pa. 270, 232 A.2d 625 (1967); *Kelmo Enter., Inc. v. Commercial Union Ins. Co.,* 426 A.2d 680 (Pa. Super. 1981). Although the court was unable to find any Pennsylvania case law involving the use of a contingent fee agreement to determine the reasonableness of a request for attorneys' fees in this type of contractual situation, Pennsylvania has allowed the awarding of attorneys' fees under a fee-shifting statute, even though the attorney prosecuted the action on behalf of a plaintiff free of charge pursuant to a contingent fee agreement. *Krassnoski v. Rosey,* 684 A2.d 635, 638 (Pa. Super. 1996). In such cases, the contingency fee between the party and counsel was seen by the court "as simply a factor to be considered by the trial court in determining the reasonableness of an award of attorneys' fees because it can aid in demonstrating an attorney's remunerative expectations." *Id.*

The trial court's discretion with respect to the reasonableness of an attorney's fees includes the authority to reduce the fee claimed and allow only such sum as the court deems reasonable. *See McMullen v. Kutz,* 603 Pa. 602, 985 A.2d 769 (2009) (holding that where a contractual provision provides for a breaching party to pay the attorney's fees of the prevailing party in a breach of contract case, the trial court may consider whether the fees claimed to be incurred are reasonable and to reduce the fees claimed if appropriate); *The Ridings at Whitpain Homeowners Assoc. v. Schiller,* 811 A.2d 1111 (Pa. Commw. 2002) (holding that the trial court did not abuse its discretion in awarding a homeowners association only a portion of the legal expenses it incurred in an enforcement action and noting that appellate review is limited to determining whether the trial court palpably abused its discretion in making a fee award).

In *LaRocca Estate,* our Supreme Court explained:

The amount of fees to be allowed to counsel, always a subject of delicacy if not difficulty, is one peculiarly within the discretion of the court of first instance. Its opportunities of judging the exact amount of labor, skill and responsibility involved, as well as its knowledge

of the rate of professional compensation usual at the time and place, are necessarily greater than ours, and its judgment should not be interfered with except for plain error. The allowance or disallowance of counsel fees rests generally in the judgment of the court of first instance and its decision will not be interfered with except for palpable error.

*LaRocca*, 431 Pa. at 548-549, 246 A.2d at 340.

The court further instructed that, in determining whether attorney's fees are reasonable, a trial court must consider numerous factors, including the following:

the amount of work performed; the character of the services rendered; the difficulty of the problems involved; the importance of the litigation; ... the degree of responsibility incurred; ... the professional skill and standing of the attorney in his profession; the result he was able to obtain; and, very importantly, the amount of money or the value of property in question.

*Id.*, at 546, 246 A.2d at 339.

The parties, although agreeing to a fee-shifting provision in their contract, did not agree to the amount of such fees to be charged. The contract does not provide for an award of fees "incurred," for instance, which would allow an award for any and all attorneys' fees. Rather, it provides for an award of "reasonable" fees. DLL has submitted two fee figures to the court for consideration. First, DLL requests that the court award fees in the amount of $9,616.93, which represents fees due to its attorneys pursuant to a contingent fee agreement. (Summ J. Mot. at Ex. H). In the alternative, DLL requests fees of $5,836.50 based upon an hourly rate ($300.00) for work performed. (Summ J. Mot. at Ex. H). The court concludes that the reasonable attorneys' fees to which DLL is entitled are $5,836.50.

A review of the record shows the amount of attorney time expended in preparing this case for disposition on summary judgment was eighteen (18) hours. If converted to hourly billing, at a rate of $300, the total fees charged are $5,836.50. In contrast, the contingent fee arrangement of 25% of collected monies, which is presented by DLL as $9,616.93, converts to a billable rate of $534.27, almost twice the normal hourly rate for counsel. Working it from the other side, at counsel's normal billable rate, the contingent fee agreement would convert to 32 hours of work, again nearly double. A review of the detailed billing and descriptions therein which counsel submitted reflects work on a matter that was fairly straightforward and involved issues that DLL has dealt with previously in similar litigation. Based upon the court's review of the detailed billings and the contingent fee agreement, the court concludes that an award of reasonable fees in the amount of $5,836.50 is rightfully due to DLL.

Plaintiff has supported the other items of claimed damage with sufficient affidavits. They will be awarded as well, as reflected in the order above.